ORIGINAL



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

Cause No.: _____

BRADLEY B. MILLER,                                )
                                                  )
    Plaintiff,                         )
                                                  )
v.                                                )
                                                  )
VIRGINIA TALLEY DUNN, individually;               )
ANDREA PLUMLEE, in both individual and official   )
capacities; DANIELLE DIAZ, in both individual and )
official capacities; PATRICIA LINEHAN ROCHELLE,   )
in both individual and official capacities; DAVID H. )
FINDLEY, in both individual and official capacities; )
MARYANN MIHALOPOULOS (aka MARYANN                 )
BROUSSEAU), in both individual and official capacities; )
THE HOCKADAY SCHOOL, by and through its Board     )
of Trustees; MEREDITH LEYENDECKER, individually;  )
BETH TAYLOR, individually; JOHN SUGHRUE,          )
individually; LACIE DARNELL, in both individual and )
official capacities; MICHAEL CHARLES KELLER, in   )
both individual and official capacities; THE COUNTY  )    INJUNCTIVE RELIEF
OF DALLAS, Texas; and THE CITY OF DALLAS, Texas   )      REQUESTED
                                                  )
    Defendants.                        )    JURY TRIAL DEMANDED
                                                  )

**3-20CV-759-E**

---

## Verified Complaint

"[F]reedom of thought and speech 'is the matrix, the indispensable condition, of nearly every other form of freedom.'"—*Fed. Elec. Comm'n v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 264 (1986) (quoting *Palko v. Connecticut*, 302 U.S. 319, 327 (1937) (Cardozo, J.)).

"No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All the officers of the government, from the highest to the lowest, are creatures of the law and are bound to obey it. It is the only supreme power in our system of government, and every man who by accepting office participates in its functions is only the more strongly bound to submit to that supremacy, and to observe the limitations which it imposes upon the exercise of the authority which it gives."

—*United States v. Lee*, 106 U.S. 196 at 220 (1882).

## Introduction

1. Plaintiff complains of various willful, systemic deprivations of fundamental rights guaranteed by both the Texas and Federal Constitutions, and which same deprivations are civil violations of 42 U.S.C. § 1983 and other statutes; criminal violations of 18 U.S.C. §§ 241 ("Conspiracy against rights") and 242 ("Deprivation of rights under color of law"); criminal violations of 18 U.S.C. §§ 1341 ("Frauds and swindles"), 1349 ("Attempt and conspiracy"), 1621 ("Perjury"), 1622 ("Subornation of perjury"), 3 ("Accessory after the fact"), and 4 ("Misprision of felony"); and criminal violations of Texas Penal Code TPC § 15.02 ("Criminal Conspiracy"), TPC § 30.02 ("Burglary"), TPC § 32.46 ("Fraud – Securing Execution of Document By Deception"), TPC § 32.48 ("Fraud – Simulating Legal Process"), TPC § 36.06 ("Obstruction and Retaliation"), and TPC §§ 37.02 ("Perjury"), 37.03 ("Aggravated Perjury"), 37.08 ("False Report to a

VERIFIED COMPLAINT 2

Peace Officer"), and 37.13 ("Falsification – Record of a Fraudulent Court"). Plaintiff also complains of malicious prosecution.

2.    Within the proceedings of still-pending case # DF-13-02616 in the 330th Family District Court, Dallas County, Texas, and in several related appeals, Plaintiff Miller duly advised the state judges, all other named parties, and various third parties, that certain actions and judicial (and pseudo-judicial) events either are now existing, and/or all have been done, in clear, unambiguous violations of basic due process, state law, state procedure, the United States Constitution, federal statutory law, and/or against the relevant rulings held by the several federal Circuit Courts of Appeal and the United States Supreme Court.

3.    Within that same state-court proceeding—and outside of it—Plaintiff has been, and is still being, affirmatively denied basic constitutional rights to at least: (A) freedom of speech and assembly; (B) the right to parent his child; (C) due process; (D) fair and competent tribunals; (E) reasonable notice and opportunity to be heard; (F) fair and lawful use in civil prosecution and defense of relevant and material evidence and of applicable statutory, rule, and case law authorities; and (G) liberty and property protections.

4.    Plaintiff has been continually harassed by the Dallas County courts, related court administration systems and officers, and the other defendants named herein, who have repeatedly violated the Plaintiff's most basic constitutional rights

VERIFIED COMPLAINT          3

by willfully, knowingly and intentionally conspiring in various commissions of criminal acts against the Plaintiff.

5.     These criminal and abusive acts against the Plaintiff have been orchestrated primarily by Defendant Virginia Talley Dunn; but they have been carried out with the willing cooperation (and often at the instigation) of her attorneys Patricia Rochelle and David Findley, the judges of the 330th Family District Court, and the other Defendants named herein.

## Jurisdiction

6.     This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(1)–(4) because this case arises under 42 U.S.C. § 1983 and the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, i.e. because this is an Article III court. This Court has further jurisdiction under 42 U.S.C. § 1988(a). At all relevant times, state-court District Judge Andrea Plumlee, Associate Judge Danielle Diaz, attorneys Patricia Linehan Rochelle and David H. Findley, and the officers of the Dallas Police Department acted under color of the statutes, ordinances, regulations, customs, and usages of the City, the County, and of the State of Texas. The Court has supplemental jurisdiction over Plaintiff Miller's state-law claims under 28 U.S.C. § 1367.

## Venue

7.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1), because the

majority of all the individual parties reside within this judicial district, and also under 28 U.S.C. § 1391(b)(2), because the majority of all events and omissions by Defendants giving rise to the claims herein also occurred within this same judicial district.

## Parties

8.     Plaintiff Bradley B. Miller (hereinafter "Miller") is an adult citizen and resident of the City of Dallas, Dallas County, State of Texas, United States of America, and a taxpayer of all four (4) said government entities. By filing this Complaint, he avails himself of this Court's jurisdiction and venue.

9.     Defendant Virginia Talley Dunn (hereinafter "Dunn") is an adult citizen and resident of Dallas County, State of Texas, United States of America. Dunn was also the Chair of the Board of Trustees of the Hockaday School from 2011-2013, and she remained on the Board until mid-2015. Dunn is a 1986 graduate of the Hockaday School. She is neither an infant, an incompetent, nor away on any military service, and is sued and prosecuted in her individual person.

10.    Defendant Andrea Plumlee (hereinafter "Plumlee") is an adult citizen and resident living presumably in Dallas County, State of Texas, United States of America, and at all material times herein purportedly acted as a state-authorized judge within the courts of the very same County. She is neither an infant, an incompetent, nor away on any military service, and is sued and prosecuted in both

her individual person and as an officer of the same court system, as well as for divestiture to the extent allowed.

11. Defendant Danielle Diaz (hereinafter "Diaz") is an adult citizen and resident living presumably in Dallas County, State of Texas, United States of America, and at all material times herein purportedly acted as a state-authorized judge within the courts of the very same County. She is neither an infant, an incompetent, nor away on any military service, and is sued and prosecuted in both her individual person and as an officer of the same court system, as well as for divestiture to the extent allowed.

12. Defendant Patricia Linehan Rochelle (Texas Bar card # 13732050, hereinafter "Rochelle" or "Patricia Rochelle") is an adult citizen and resident living in Dallas County, State of Texas, United States of America, and at all material times herein practiced law as a state-licensed attorney within the courts of the very same County. She is neither an infant, an incompetent, nor away on any military service, and is sued and prosecuted in both her individual person and as an officer of the same state court system, as well as for divestiture to the extent allowed.

13. Defendant David H. Findley (Texas Bar card # 24040901, hereinafter "Findley" or "David Findley") is an adult citizen and resident living presumably in Dallas County, State of Texas, United States of America, and at all material times herein practiced law as a state-licensed attorney within the courts of the very same

VERIFIED COMPLAINT 6

County. He is neither an infant, an incompetent, nor away on any military service, and is sued and prosecuted in both his individual person and as an officer of the same state court system, as well as for divestiture to the extent allowed.

14. Defendant Maryann Mihalopoulos (Texas Bar card # 03087475, aka "Maryann Brousseau" and "Maryann Sarris Brousseau," hereinafter "Mihalopoulos") is an adult citizen and resident living in Dallas County, State of Texas, United States of America, and at all material times herein practiced law as a state-licensed attorney within the courts of the very same County. Mihalopoulos was also the Chair of the Board of Trustees of the Hockaday School from 2013-2015, immediately succeeding Dunn in that position. Mihalopoulos is a 1978 graduate of the Hockaday School. She is neither an infant, an incompetent, nor away on any military service, and is sued and prosecuted in both her individual person and as an officer of the same state court system, as well as for divestiture to the extent allowed.

15. Defendant the Hockaday School (hereinafter "Hockaday") is an educational institution located and operating in Dallas County, State of Texas, United States of America. Hockaday is sued and prosecuted through its Board of Trustees, the members of which are adult citizens and residents living presumably in Dallas County, Texas, in their individual persons. The members of the Hockaday Board are neither an infant, an incompetent, nor away on any military

VERIFIED COMPLAINT                    7

service. The Hockaday School is located at 11600 Welch Rd., Dallas, Texas 75229.

16. Defendant Meredith Leyendecker (hereinafter "Leyendecker") is an adult citizen and resident of Dallas County, State of Texas, United States of America. Leyendecker is a 2006 graduate of the Hockaday School. Leyendecker is and was an employee of Defendant Dunn at Talley Dunn Gallery at all relevant times. She is neither an infant, an incompetent, nor away on any military service, and is sued and prosecuted in her individual person.

17. Defendant Beth Taylor (hereinafter "Taylor") is an adult citizen and resident of Dallas County, State of Texas, United States of America. Taylor was an employee of Defendant Dunn at Talley Dunn Gallery at all relevant times. (To Miller's knowledge, Taylor left the employ of Defendant Dunn in 2017). She is neither an infant, an incompetent, nor away on any military service, and is sued and prosecuted in her individual person.

18. Defendant John Sughrue (hereinafter "Sughrue") is an adult citizen and resident of Dallas County, State of Texas, United States of America. He is neither an infant, an incompetent, nor away on any military service, and is sued and prosecuted in his individual person.

19. Defendant Lacie Darnell (hereinafter "Darnell") is an adult citizen and resident living presumably in Dallas County, State of Texas, United States of

America, and at all material times herein purportedly acted as a state-authorized and city-authorized police within the City of Dallas and within Dallas County. She is neither an infant, an incompetent, nor away on any military service, and is sued and prosecuted in both her individual person and as an officer of the City of Dallas, as well as for divestiture to the extent allowed. She may be served with process at the Dallas Police Headquarters, 1400 South Lamar Street, Dallas, TX 75215, or wherever she may be found and served by law.

20. Defendant Michael Charles Keller (hereinafter "Keller") is an adult citizen and resident living presumably in Dallas County, State of Texas, United States of America, and at all material times herein purportedly acted as a state-authorized and city-authorized police within the City of Dallas and within Dallas County. He is neither an infant, an incompetent, nor away on any military service, and is sued and prosecuted in both his individual person and as an officer of the City of Dallas, as well as for divestiture to the extent allowed. He may be served with process at the Dallas Police Headquarters, 1400 South Lamar Street, Dallas, TX 75215, or wherever he may be found and served by law.

21. Defendant The County of Dallas, Texas (hereinafter "Dallas County" or "the County"), is a local political subdivision and unit of government addressed through its executive, the Commissioners' Court of Dallas County, which is the statutory executive entity responsible for all business and acts of the County, one

VERIFIED COMPLAINT 9

of two hundred and fifty-four (254) various counties created under the laws of the State of Texas. It is the governmental entity responsible for raising taxes and appropriating funds for the proprietary functions of county government operated within its own political boundaries, including the relevant court, law enforcement, and other systems therein. Defendant Dallas County is ultimately responsible for seeing that its various court, law enforcement, and all such other systems are administered so as not to conflict with any statutes, rules, regulations, or the Constitutions of either the State of Texas, or of the United States of America. Defendant Dallas County is sued in its individual, vicarious and *respondeat superior* capacities for acts and/or inactions, both by it and its subordinates described herein, committed necessarily outside and against the law, and also is sued in its official capacity for the various purposes of certain injunctive and declaratory relief herein.

22. Defendant The City of Dallas, Texas (hereinafter "the City") is a municipality located in Dallas County, Texas. The City of Dallas operates the Dallas Police Department ("DPD"). The City of Dallas funds and operates the DPD, along with the Dallas City Council, the Dallas City Manager, Mayor Eric Johnson, and Chief of Police U. Renee Hall; and these entities and individuals are responsible for the implementation of the police department's budget, policies, procedures, practices, and customs, as well as the acts and omissions, challenged

VERIFIED COMPLAINT               10

by this suit. The DPD is also responsible for preventive, investigative, and enforcement services for all citizens of The City of Dallas. The City of Dallas may be served with citation herein by and through its agent for service of process, Christopher J. Caso, Interim City Attorney, at 1500 Marilla Street, Dallas, Texas 75181, or wherever he may be found.

## Factual Background

23. Defendant Plumlee's state Bar number is 00788465, and she was admitted to the practice of law by and under duly-sanctioned authorities of State of Texas on November 5, 1993.

24. Defendant Diaz's state Bar number is 24044891, and she was admitted to the practice of law by and under duly-sanctioned authorities of the State of Texas on December 6, 2007.

25. Defendant Rochelle's state Bar number is 13732050, and she was admitted to the practice of law by and under duly-sanctioned authorities of State of Texas on November 6, 1978.

26. Defendant Findley's state Bar number is 24040901, and he was admitted to the practice of law by and under duly-sanctioned authorities of State of Texas on November 6, 2003.

27. Defendant Mihalopoulos' state Bar number is 03087475, and she was admitted to the practice of law by and under duly-sanctioned authorities of State of

Texas on November 2, 1984.

28.     In order to pass the bar of The State of Texas and receive their licensure, Defendants Plumlee, Diaz, Rochelle, Findley, and Mihalopoulos were duly required to not only learn and comprehend rudimentary legal basics such as equal protection of the laws, equal rights of citizens, prohibition of fraud in a court of law, and their own professional ethics rules, but were also required to duly swear their own individually-corresponding oaths of office and compliance upon all of these issues.

29.     The duly-sanctioned authorities of Defendant Texas require and provide Defendants Plumlee, Diaz, Rochelle, Findley, and Mihalopoulos with various annual, continuing educations regarding practice of law, and also do so under established threat of pains and penalties against their said same licensure.

30.     Defendant Lacie Darnell is an officer employed by the Dallas Police Department and the City of Dallas.  At all relevant times, she was acting as a city official.  Officer Darnell's DPD badge number is 10468.

31.     Defendant Michael Charles Keller is an officer employed by the Dallas Police Department and the City of Dallas.  At all relevant times, he was acting as a city official.  Officer Keller's DPD badge number is 9888.

32.     Plaintiff Miller has previously complained of rights violations against him by Defendants Dunn, Rochelle, Findley, Mihalopoulos, Plumlee, Diaz, Darnell,

Keller, Dallas County, and the City of Dallas in other legal proceedings. These cases include 330th Family District Court case numbers DF-13-02616 and DF-18-06546; Texas Supreme Court Case # 16-0487; United States Supreme Court case numbers 16-9012, 17-6836, and 18-7450; United States Court of Appeals for the Fifth Circuit case numbers 16-11817 and 18-10897; United States District Court for the Northern District of Texas case numbers 3:16-CV-3213, 3:18-CV-967, and 3:18-CV-1457; 191st Civil District Court case # DC-15-01598; Court of Appeals for the Fifth District of Texas case numbers 05-19-00197-CV (still pending) and 05-15-00444-CV; Court of Appeals for the Fifth District of Texas case # 09-19-00345 (still pending); and 191st Civil District Court case # DC-15-01598. Plaintiff Miller hereby incorporates by reference all facts and allegations contained in by, and through the prior filed documents in these cases the same as if all of the same facts and allegations had been fully set forth herein.

### Background to Dunn's Divorce Suit Against Miller

33.    Defendant Dunn filed for divorce against Plaintiff Miller on February 13, 2013.  That case (DF-13-02616) was assigned to the 330 Family District Court, Dallas County, Texas.

34.    Defendant Andrea Plumlee, District Judge of the 330th Family District Court, has presided over that state-court case since its inception.

35.     In the year prior to the divorce filing, Dunn's behavior had grown increasingly erratic. Dunn—though she was the Chair of the Hockaday Board of Trustees at the time—became irrationally convinced that her (and Miller's) daughter would never be admitted to Hockaday unless she applied immediately. Dunn became obsessed with moving her daughter to Hockaday to the point that she repeatedly threatened to kill Miller, to kill herself, and to "fucking divorce" Miller if their daughter did not enroll there immediately—rather than after the fourth grade, as they had previously planned. Dunn's frightening outbursts of rage and verbal abuse of Miller became so frequent and relentless that Miller felt compelled to record some of these conversations—both to obtain psychiatric help for Dunn, and for his own safety. In one such recording, Dunn—calling Miller from her car in August 2012—begins screaming frantically, "I'm going to kill myself!" before the call disconnects. Dunn's conduct was extremely traumatic for Miller.

36.     Miller, through research of his own, came to suspect in 2012 that Dunn had Borderline Personality Disorder and Narcissistic Personality Disorder. The latter diagnosis was proposed by a UT Southwestern Medical School professor and psychiatrist who had seen Miller and Dunn in marriage counseling sessions in early 2012, and briefly in 2007. (This psychiatrist was chosen by Dunn, as he shared an office with a former colleague of Dunn's mother.)

VERIFIED COMPLAINT                    14

37.     Earlier in 2012, Miller discovered that Dunn had been sending romantic text messages to artist David Bates, whom she represented and continues to represent at her business, Talley Dunn Gallery.  Miller made this discovery after witnessing a flirtatious interaction between Dunn and Bates at an art gallery opening in January 2012.  At that time, Miller and Dunn and had been in a relationship for more than 26 years, and Miller had known Bates since the early 1990s.  Miller never previously had a reason to suspect an improper relationship between Dunn and Bates.

38.     In 2011, Dunn forced her former business partner, Lisa Hirschler Brown, out of their profitable gallery business by nefarious means.  During this months-long legal struggle—much of which Miller witnessed firsthand—Dunn plotted extensively with David Bates against Brown; and Bates eventually provided Dunn with a $250,000 loan to buy out Brown's share of the gallery property.  (Brown was given nothing for the business itself, though she had been just as instrumental as Dunn in its development and success since its 1999 inception.)  Dunn also lied extensively to Miller about Brown in order to gain his acquiescence, telling him falsely that Brown had stolen art and money from the gallery, and that Brown was drinking, taking drugs, and behaving bizarrely.  To Miller's knowledge, all of Dunn's statements were fabrications, but it took two years for Miller to realize that Dunn was lying to him.  Miller had previously been on good terms with Brown,

VERIFIED COMPLAINT                    15

who remains his daughter's godmother. (However, Dunn has kept Brown away from Dunn's and Miller's daughter since 2012, much to Brown's dismay, and to the child's detriment.)   Miller eventually came to realize that Dunn is a pathological liar, and that Dunn's vicious attacks against him are merely a smokescreen to prevent her unethical and illegal conduct from becoming public knowledge.

39.   Miller has previously asserted—and re-alleges herein—that Dunn filed for divorce in order to conceal her improper relationship with artist David Bates, to deprive Miller of marital assets, and to gain control of her daughter's educational placement in order to move her to Hockaday a few years early.

### The Divorce Begins—Dunn Makes False Domestic Violence Allegations

40.   The day that Dunn filed for divorce, i.e. February 13, 2013, she arranged for her current stepfather, Willis Duff, to be present in Miller's and Dunn's marital home under the false pretenses of visiting Dallas for a Salesmanship Club reunion. Duff told Miller that if he did not leave the house immediately, Dunn "will have the cops throw you [i.e. Miller] out."   A process server came to the door later that day and served Miller with Dunn's divorce petition.

41.   When Miller did not leave his house immediately, Dunn filed an affidavit containing false allegations of Domestic Violence, claiming that Miller "threw a bench" at her in a hotel room the prior November.   These allegations have never

been substantiated. Miller has repeatedly claimed—and re-alleges herein—that these allegations are entirely false, and that Dunn fabricated them and committed perjury in order to gain advantage in her divorce suit. Defendants Rochelle and Findley assisted Dunn in this effort.

42.     As a result of Dunn's false allegations, the 330th Family District Court issued an ex-parte order illegally evicting Miller from his marital home. Miller was forced to leave his home permanently on February 25, 2013.

43.     On March 27, 2013, at a Kafkaesque initial hearing in the divorce case— and because of Dunn's false allegations—former 330th Family Court Associate Judge Johnese White Howard imposed a supervision requirement on Miller. Miller thus had to have a supervisor to see his own daughter. Dunn objected to Miller's parents serving as supervisors, so Associate Judge Howard appointed Miller's sister and Dunn's nanny—who was not a legal resident of the United States. Howard also granted Dunn exclusive use of the marital home, the business, and all assets, depriving Miller of the same.

44.     This supervision requirement lasted for five months, which is how long it took to obtain a de novo hearing before District Judge Andrea Plumlee on the matter.

45.     Judge Johnese White Howard was later arrested for DWI in 2014 and left the bench. Her mugshot and arrest information are available at https://mugshots.

com/US-States/Texas/Collin-County-TX/Johnese-White-Howard.82631759.html .

46.     On March 23, 2013, without Miller's consent or knowledge, Dunn signed forms enrolling their daughter in the Hockaday School.  Miller did not learn this fact until May 16, 2013—though he had previously met with Hockaday Head of School Kim Wargo on April 22, 2013 to inform her of the situation, of Dunn's lies to the court, and that he did not want his daughter to move to Hockaday under those circumstances.  (Dunn had chaired the search committee that brought Wargo to Hockaday; thus Dunn was directly responsible for Wargo's hiring.)

47.     On April 9, 2013, Miller's father, the former *Dallas Morning News* columnist Robert Miller, had a heart attack and underwent an emergency stent procedure without anesthetic.  He had been under extreme stress from Dunn's actions in his son's divorce.

48.     On May 29, 2013, Dunn filed a motion to remove Miller's sister as Miller's custody supervisor, and Dunn subsequently refused to allow Miller's daughter to stay with him for the next two weekends; these are just two of Dunn's many violations of the 330th Family District Court's custody orders.  Neither Judge Plumlee nor Judge Diaz has ever disciplined Dunn for these violations.

49.     Two days later, on May 31, 2013, Miller called David Haemisegger, who was both an acquaintance and a Hockaday Board Executive Committee member, to inform him of Dunn's unethical and illegal conduct and to convey that Dunn did

VERIFIED COMPLAINT                18

not have unilateral control over school placement. Haemisegger said he had no idea that this was happening, and that he was "stunned."

50.     On June 3, 2013, a hearing was held before Associate Judge Howard on Dunn's motion to allow her to move her daughter to Hockaday. Associate Judge Howard declined to rule because a de novo hearing was pending on the supervision issue.

51.     On June 6, 2013, Dunn called Miller and said, "I'll give up weekend supervision if you'll let [our daughter] go to Hockaday." Incredulous, Miller said, "It's way too late for that!" Miller declined Dunn's offer, preferring to wait for the upcoming hearing before Judge Plumlee.

52.     In mid-June 2013, a mutual friend of Dunn's and Miller's informed Miller that Defendants Dunn and Maryann Mihalopoulos had recently traveled to Palm Beach, Florida, and that—in Dunn's words—the two had "bonded over [their] horrible divorces." Miller's and Dunn's daughter was also present on that trip.

53.     Dunn and Mihalopoulos met while serving on the Hockaday Board together and had no prior acquaintance. Mihalopoulos never came to Miller's house during the 28 years of his relationship with Dunn, and Miller only met Mihalopoulos in the context of Hockaday Board events starting around 2011.

54.     After a two-part de novo hearing on June 19 and July 10, 2013—at which Miller presented the recordings and text messages mentioned above—Judge

Plumlee vacated Judge Howard's supervision requirement ruling. Plumlee indicated that it was clear that Dunn had misled the court in order to change her daughter's school, saying, "It doesn't feel good" and "It doesn't smell right" and that she didn't want to "reward" Dunn for doing so—but Plumlee ruled that Miller's and Dunn's daughter would attend Hockaday the next year anyway. Dunn was not sanctioned for perjury. Plumlee also upheld Associate Judge Howard's ruling depriving Miller of his home, assets, and any proceeds from the marital business. At that time, and just to fight the supervision ruling and school placement issue, Miller already spent more than $54,000 on lawyers.

55. At the end of that hearing, Plumlee signed an *Order for Social Study/Psychological Evaluation*, naming psychologist Benjamin J. Albritton as the custody evaluator. Albritton had been selected by Defendant Rochelle; she and Albritton had worked together in prior legal cases. The mandatory evaluation deposit was $10,000; after initial testing and interviews, and despite multiple requests by Miller, Albritton repeatedly refused to issue a report.

56. On September 5, 2013, while Miller was picking up his daughter for dinner, Dunn refused to hand over her daughter for a court-ordered possession. Dunn then filed a police report, falsely claiming that Miller had threatened her, and also filed an emergency motion for a protective order in the 330th Family District Court, asking that Miller be barred from custody of his daughter.

VERIFIED COMPLAINT            20

57.     On September 6, 2013, because both judges of the 330th Family Court were absent, Dunn's motion was heard by Associate Judge Andrew Ten Eyck. In that hearing, Dunn's attorney, Defendant Patricia Rochelle, made a false statement of material fact by falsely claiming that the earlier supervision requirement "was lifted by mutual agreement," when in fact it had been litigated and vacated after the aforementioned lengthy de novo hearing. Judge Ten Eyck denied Dunn's motion.

58.     On August 16, 2013, Miller met with Hockaday Head of School Kim Wargo to inform her of the outcome of the June/July hearing, and to express his displeasure that Hockaday had not notified him of Dunn's actions regarding enrollment of his daughter and Dunn's prior payment of tuition.

### Gag Orders Begin

59.     In September 2013, fed up with Dunn's conduct in the 330th Family Court case, Miller wrote to two friends of Dunn's and his, Hockaday graduates Kate Hoak Power and Betsie Tart Sears, asking for their assistance.

60.     In response, on October 8, 2013, Defendants Dunn, Rochelle, and Findley filed a *Motion to Enter Confidentiality Order* in the 330th Family District Court. Miller's two letters to Power and Sears were attached as exhibits.

61.     On November 6, 2013, Associate Judge Howard heard Dunn's confidentiality motion. At this hearing, Defendant Rochelle complained to the court that Miller had spoken to Hockaday Head Kim Wargo about Dunn. (It was

thus apparent that Wargo had informed Dunn about the meeting with Miller; no one at Hockaday ever informed Miller about the school's discussions with Dunn.) Defendant Rochelle requested a broad gag order. When Miller's then-attorney, Michael Wysocki, objected to its unconstitutionality, Associate Judge Howard signed an order enjoining Miller from speaking "with business associates, clients, customers, and/or potential business transactions" (*sic*). Because literally anyone might be construed as a client of Dunn's gallery, this injunction effectively prohibited Plaintiff Miller from speaking to anyone about Dunn, or about the divorce. The end result was that Miller could not seek help from anyone regarding the divorce or his daughter's welfare; Miller could not defend himself in public against Dunn's lies; and Dunn was allowed to lie about Miller with impunity.

62. At this point, Plaintiff Miller had been forced to spend more than $200,000 in his legal defense.

63. Miller was later informed that, on or around November 17, 2013, Defendant Dunn trespassed into Miller's parent's home—uninvited, and unbeknownst to Miller—and photographed Miller's computer desk area, where his working documents from the divorce case were assembled and visible. (Dunn thus violated TPC § 30.02.) Dunn then emailed this photo to Defendant Rochelle. (Dunn's alleged email and photo are attached as **Exhibit "A"**.) Miller was also informed that Dunn took and emailed several other digital photos of Miller's

VERIFIED COMPLAINT                22

residence on November 13, 2013; and that Dunn's nanny took other indoor photos of Miller's residence in July 2013 and provided them to Dunn.

64.     At no point during the divorce, or since, has Dunn ever been allowed to be present in Miller's home, or in Miller's parent's home. Thus Dunn's actions constitute burglary and invasion of privacy, as well as misappropriation of evidence in an active lawsuit.

65.     On January 17, 2014, a de novo hearing on this confidentiality order was held before Judge Plumlee. In this hearing, Defendant Rochelle falsely asserted that Miller had agreed to a confidentiality order. Miller stated that he did not want a confidentiality order, period, because secrecy allowed an abuser like Dunn to act with impunity. At the end of the hearing, Judge Plumlee vacated Judge Howard's gag order, but then imposed an even broader gag order enjoining "disparagement." Miller was thus gagged from November 2013 until his divorce case concluded in April 2014.

66.     On January 14, 2014, Miller's attorney filed a motion in the 330th Family District Court to take the deposition of artist David Bates. Bates filed a motion to quash the deposition; this motion was signed by his attorney, Elayna Naftis Erick. Erick, a 1996 graduate of Hockaday, was and still is employed by Brousseau Naftis & Massingil, P.C.—the law firm of Defendant Maryann Mihalopoulos (aka Maryann Brousseau). Though Mihalopoulos was not representing Dunn directly,

Miller found it grossly unethical that Mihalopoulos's firm would get involved in his divorce, since Mihalopoulos was then the Hockaday Board Chair, and Miller's and Dunn's daughter was a student at Hockaday. For reasons unclear to Miller, the deposition of David Bates never took place.

67. On February 25, 2014, Miller and Dunn attended a pre-trial mediation session. (Trial was scheduled for April 2, 2014.) After 16 hours of mediation, Miller's attorney, Carol Wilson, suddenly informed Miller that she would not represent him beyond that night if he did not sign the proposed Mediated Settlement Agreement ("MSA"), because Miller did not have the money to continue paying her. Though Miller strongly disapproved of the terms of the MSA, he signed the agreement under duress because he was exhausted and he felt he had no choice. Miller has previously asserted—and again asserts herein—that his signing of the MSA was the result of coercion. Dunn would not agree to drop her request for a permanent gag order, so that issue remained to be litigated.

68. Determined to retain his right to free speech, Miller hired appellate attorney Bruce Thomas to draft a First Amendment memorandum in opposition to Dunn's request for a permanent gag order. Thomas filed the memorandum on March 28, 2014. Dunn, along with her attorneys Patricia Rochelle and David Findley dropped the demand for a permanent gag order, and Miller's and Dunn's divorce became final on April 2, 2014. Defendant Plumlee signed the divorce

decree. The gag order against Miller lapsed at that time.

69.    Miller had spent more than $270,000 on his divorce case, most of that amount borrowed from his elderly parents. His divorce expenses exceeded his share of the marital estate.

### Communications with Mihalopoulos and the Hockaday Board

70.    On April 9, 2014, once again free to speak, Miller sent the first of a series of emails to the Hockaday Board of Trustees, informing them of Dunn's illegal conduct and requesting that Dunn be removed from the Board. Miller emailed Hockaday Board Executive Committee member David Haemisegger, whom he had previously contacted a year prior, to update him on the divorce case and to express his misgivings about his daughter being molded by a place like Hockaday, when it was being led by people like Dunn. Haemisegger did not respond.

71.    Miller was later informed that Defendant Leyendecker wrote to Defendants Dunn, Rochelle, and Findley on May 16, 2014, saying that Miller needed "medication." Leyendecker's act constitutes libel.

72.    On November 9, 2014, in a message addressed to Defendant Mihalopoulos, Miller again wrote to the Hockaday Board. In his email, Miller summarized the events surrounding the divorce, stated that "[t]here is absolutely no excuse for accepting the ongoing abuse of members of the Hockaday community by a Trustee," and again requested that Dunn be removed from the

Hockaday Board. Miller also asked Mihalopoulos to look into why Hockaday had enrolled his daughter in 2013 "in contravention of a court order."

73.    Miller was later informed that Defendant Maryann Mihalopoulos contacted Defendants Dunn and Rochelle on November 10, 2014—immediately following Miller's email to Hockaday, described above—and recommend that they ask the court for a protective order, using Miller's email as grounds. (Mihalopoulos' alleged email is attached as **Exhibit "B".**)    Mihalopoulos also indicated that she was attempting to get Hockaday to take legal action against Miller—presumably for exercising his First Amendment rights, and for criticizing the unethical and illegal conduct of two Hockaday Board Chairs (including herself)—but that she doubted the school would act. On that day, Mihalopoulos also apparently wrote to Dunn and Rochelle, saying that Miller was "crazy."

74.    On November 13, 2014, Mihalopoulos emailed a reply to Miller. She said only, "I received your e-mail. The issues presented in your e-mail are personal in nature and, thus, do not fall within the scope of the Board's purview. Accordingly, the Board will not be taking any action in response to your e-mail."

75.    On December 5, 2014, Miller replied to Mihalopoulos, saying that the issues he raised did indeed pertain to Hockaday, and that the school should choose "…Board leaders whose conduct and character the school can be proud of." Mihalopoulos did not respond.

VERIFIED COMPLAINT            26

### Dunn Sues Miller in Civil Court, Requests Another Gag Order

76. On February 11, 2015, Dunn filed a state civil suit against Miller (case # DC-15-01598), requesting yet another gag order. Dunn complained of "tortious interference" with her business relationships—because the Hockaday Board members Miller had contacted had purchased art from Dunn's gallery. A Temporary Restraining Order (TRO) was immediately granted by District Judge Gena Slaughter of the 191st Civil District Court. The TRO contained an injunction against Miller's contacting "artists, collectors, curators, clients, customers, or other business associates of Dunn"—effectively once again prohibiting Miller from speaking to anyone about Dunn and her abusive actions.

77. The first hearing in the 191st Civil District Court took place on March 2 and March 4, 2014 before Judge Gena Slaughter. Judge Slaughter disclosed that she was friends with attorney Lisa Blue-Baron, a former (and current) employer of Defendant Beth Taylor, who was Dunn's employee at the time, but stated that this relationship would not affect her judgment. (Blue-Baron's daughter was subsequently admitted to Hockaday and is currently a student there.)

78. At the end of the hearing, which featured Miller's emails to the Hockaday Board and his other entirely truthful communications about Dunn, and Dunn's repetitions of her previous lies about Miller, Judge Slaughter—incredibly—found that Miller's intent "is clearly to harm Ms. Dunn personally and to harm her

VERIFIED COMPLAINT            27

vicariously through the gallery." (Miller is in possession of the reporter's record from this hearing. The evidence does not support Slaughter's ruling.) However, Slaughter also ruled that the TRO's restrictions on Miller's speech and on his use of recordings of his own conversations were unconstitutional, and she lifted them. Miller was thus once again free to speak—if only briefly.

79.    Miller, now free to defend himself in public, posted a link on his Facebook page to audio clips from his August 2012 conversations with Dunn, in which she threatened to divorce him if he did not assent to moving their daughter to Hockaday immediately. Miller did so to demonstrate Dunn's true character, and that the claims in her suit were lies designed to hide her own conduct.

### Further Communications with Hockaday – March 2015

80.    On March 8, 2015, Miller met again with Hockaday Head of School Kim Wargo, along with Head of Lower School Randall Rhodus. Miller informed Wargo about the hearings in the 191st District Court, and said that Dunn's conduct was not in keeping with Hockaday's ideals. Miller said that Mihalopoulos (then the Board Chair) had assisted Dunn in her campaign against him, at least indirectly (i.e. by her firm's having represented David Bates), and that he was unhappy with how Hockaday had handled the situation from the outset. Miller said that he did not want his daughter to be in an environment that was shaped by people like this. Wargo did not say much, and did not express any sense of outrage at these events.

81.     The next day, on March 9, 2015, Miller again emailed the Hockaday Board, and for the first time copied every member of the Board. Miller reiterated his concerns about Dunn's conduct during the divorce, stated that Hockaday "effectively assisted Dunn in violating a court order by enrolling [his] daughter while the divorce case was open," noted Mihalopoulos' unethical involvement in Miller's divorce through her firm's representation of David Bates, updated the Board on Dunn's civil suit against him, and asked the Board to intervene.

82.     On March 12, 2015, Mihalopoulos responded by email, copying only five Hockaday Board members and Head of School Kim Wargo. Mihalopoulos denied any wrongdoing by herself or Hockaday, and reiterated, "Your divorce from Ms. Dunn and related issues involving her business and your family are personal and matters which are not topics for Board discussion or action." With regard to David Bates, Mihalopoulos wrote, "[my] law firm's representation of a potential third party in your divorce proceeding is not a breach of any ethical duty." Mihalopoulos did not mention or otherwise disclose that she had instructed Dunn and Rochelle to request a gag order against Miller, in a clear conspiracy to violate Miller's constitutional right to free speech.

83.     Also on March 12, 2015, Judge Gena Slaughter held an extended hearing session on Dunn's motion for a TRO. Dunn once again wanted to gag Miller; Miller's attorney, Eric Wood, again argued that the First Amendment prohibits

VERIFIED COMPLAINT             29

prior restraints on speech. Dunn's attorney presented Miller's March 9, 2015 email to the Hockaday Board as evidence. Slaughter, waffling this time, said that she would read the case law and issue a ruling the next day. However, four days went by, and Slaughter did not issue a ruling.

84.    On March 15, 2015, Miller uploaded to YouTube excerpts from a deposition of Chuck Brown, the husband of Dunn's former business partner. In this video, Brown made several comments about Dunn's behavior toward his wife that cast Dunn in a negative light. Miller did so in order to illustrate that Dunn's claims about him in her lawsuit were false, and that others agreed with his assessment of Dunn.

### Another Hockaday Connection Suddenly Appears – Judge Ted Akin

85.    On March 16, 2015, another hearing was held in the 191st Civil District Court, this time on Miller's Anti-SLAPP motion to dismiss. Strangely, Judge Slaughter was absent, reportedly because her father was in poor health, and Judge Ted Akin was on the bench. Miller was not familiar with Akin. Dunn's attorney, Dan Hartsfield, once again claimed that Miller was trying to "smear" Dunn, and he complained about Miller's posting of his 2012 conversations with Dunn. Judge Akin said that he would talk to Judge Slaughter and issue a ruling the next day.

86.    Miller discovered soon after the hearing that Ted Akin, a retired appellate Justice who served on the Texas 5th District Court of Appeals, has two daughters

who both graduated from Hockaday near Dunn's year, and whom Dunn knew—a clear conflict of interest that he failed to disclose. Miller also learned that, since 1955, Akin has been a member of Brook Hollow Golf Club—where Dunn's grandfather belonged, and which Dunn frequented throughout her childhood. Akin also failed to disclose that conflict. Akin further failed to disclose that he is the former Director of the North Texas Multiple Sclerosis Society; Dunn has publicly claimed that she has Multiple Sclerosis. Judge Akin's connection to Hockaday, his prior connection to Dunn, and his sudden appearance in the lawsuit seemed highly suspicious to Miller.

87. Miller also subsequently learned that, in 1978, Akin had his father-in-law, architect George Dahl, committed to a psychiatric institution in order to gain control of Dahl's fortune. Dahl subsequently sued Akin for civil rights violations; and in 1983, Akin lost a $1.2 million judgment to Dahl. (*See Dahl v. Akin*, 645 S.W.2d 506 (Tex. App. 1982); Akin v. Dahl, 661 S.W.2d 917 (Tex. 1983)). Somehow, Akin was allowed to retain his position on the Texas 5th District Court of Appeals despite his criminal act.

88. On March 18, 2015, Judge Akin issued a ruling. He denied Miller's motion to dismiss (providing no grounds for doing so), called it "frivolous," and awarded Dunn attorneys' fees for the hearing. Further, Akin granted Dunn's broad new version of the Temporary Restraining Order, which blocked Miller's access to

evidence of Dunn's affair with David Bates, enjoined Miller from using many of the very recordings that Slaughter had approved as legal, and which imposed a broad gag order enjoining interference "with prospective business relationships between artists, collectors, curators, clients, customers" and Dunn. Akin's TRO also enjoined telling any "client, collector," etc., that Dunn committed perjury during the divorce and that Dunn forced her former business partner out of the gallery "without any compensation"—though Miller personally knew both statements to be true. But while this gag order was unconstitutionally restrictive, Miller still had the freedom to communicate in public, and to Hockaday, about Dunn's abusive actions toward him.

89.    Dunn's civil suit cost Miller an additional $50,000, raising his total legal expenses to $320,000. Miller immediately prepared to appeal Akin's ruling.

90.    Miller suspects that Ted Akin was hand-picked to issue an unconstitutional ruling against Miller. The very strong circumstantial evidence glaringly suggests a conspiracy among Dunn, Mihalopoulos, Slaughter, and Akin against Miller on behalf of Hockaday—i.e. to silence Miller's warranted criticism of the Hockaday Board, and to smear his reputation—that should be thoroughly explored in discovery in this suit.

91.    On March 19, 2015, Miller met again with Hockaday Head of School Kim Wargo and gave her an update on the hearings in the 191 Civil District Court and

Ted Akin's ruling. After the meeting, Miller walked down the hall to the Hockaday Development office and spoke with Amy Spence, a 1987 graduate of the school. Miller asked Spence if she had Hockaday Annual Reports from the year 1982-1992. Spence said she would locate them and contact Miller when they were ready. (Miller wanted to know if Judge Ted Akin had donated money to Hockaday in the past, but he did not mention his goal to Spence.) Spence never contacted Miller thereafter.

92. On April 10, 2015, Miller again emailed the Hockaday Board, copying several members of the media. Miller recounted the recent court hearings, noting Ted Akin's ruling and his Hockaday connection. Miller again requested Dunn's removal from the Hockaday Board, emphasizing that her ability to gain sympathy from judges stemmed primarily from her high position at Hockaday. Miller reiterated that Dunn's conduct and Mihalopoulos' legal involvement were indeed Hockaday's concern, since both were Board leaders; and Hockaday's conduct constituted a breach of the school's ethical duty to both Miller and his daughter. Miller also noted that Dunn had testified that both Mihalopolous and trustee David Haemisegger had purchased art from Dunn during the divorce; thus the two Hockaday trustees were effectively funding Dunn's court campaign against him. Finally, Miller included a link to Chuck Brown's deposition video on YouTube, in which Brown understandably calls Dunn "a monster" and "evil."

## Dallas Art Fair Incident – Dunn, Leyendecker, and Taylor Involve the

## Dallas Police in Further Violations of Miller's Rights

93.     On April 11, 2015, Miller attended a tour of the Dallas Art Fair at the Fashion Industries Gallery building at 1807 Ross Avenue in downtown Dallas. (This incident is described in a contemporary affidavit drafted by Miller, which is attached as **Exhibit "C".**) Miller had been invited by the Yale and Harvard Clubs of Dallas. Both clubs were guests of John Sughrue, a Harvard graduate who also co-founded the Dallas Art Fair. Miller saw Defendants Taylor and Leyendecker at the art fair; they were working in Dunn's booth. Miller did not see Dunn there, and he had no interactions with her. After the tour, Miller was accosted by two Dallas Police Officers, Michael Charles Keller (Badge #9888) and Lacie Darnell (Badge #10468). The officers indicated that Dunn had told them that Miller had a restraining order against him. The officers called in Miller's driver's license number and established that he did not, in fact, have a restraining order against him. However, they then evicted Miller from the art fair on the basis of Dunn's fraudulent complaint, threatening to charge Miller with criminal trespass if he did not leave. The two officers then escorted Miller out of the building, in full view of the crowd of visitors at the art fair—thus violating his First and Fourth Amendment rights.

94.     This incident marked Dunn's second false report to police regarding

Miller.

95.     Miller later filed a complaint against Dunn and the DPD officers involved

regarding this incident (DPD Internal Affairs Control # CN2016-161), and testified

before the Dallas Citizens Police Review Board Hearing on April 11, 2017. After

an investigation, the DPD declined to discipline the officers involved.   DPD

Officer Keller, however, was reprimanded for later failing to appear at a hearing

for which Miller had subpoenaed him. (That hearing, described below, took place

on July 23, 2015.)

96.     On April 12, 2015, Miller sent an email to Defendants Leyendecker and

Taylor, asking them to make a written record of what they had done and witnessed

at the Dallas Art Fair on the previous day, and also of anything that Dunn had said

about him during and before his divorce.     Neither Leyendecker nor Taylor

responded.

97.     On April 14, 2015, Miller emailed John Sughrue, notifying him of the

events at the Dallas Art Fair, especially Dunn's actions, and stating his wish that

"[n]o participant in any Yale Club or Ivy event is ever treated in such an insulting

and abusive manner again."

98.     Sughrue emailed Miller back on April 16, 2015, saying that he "had no

knowledge of the event when it occurred," that he was "trying to get up to speed"

regarding the incident, and that he would contact Miller when he knew more.

Miller emailed Sughrue later that same day, thanking him for the tour, and stating that he had filed an Open Records Request with the Dallas Police Department regarding the incident.

99.     On April 28, 2015, Miller still had not heard from Sughrue, so he sent another email to Sughrue asking if he had spoken with his employee about the Art Fair incident.

100.    On May 6, 2015, Sughrue emailed Miller, saying that his employee, Tracy Moberley, had drafted a report, and that he would contact Miller when he had reviewed it. Miller replied later that day, thanking Sughrue for the update.

101.    On May 12, 2015, Sughrue again emailed Miller, saying that he was in New York, and would contact Miller later in the week. Sughrue emailed Miller again on May 15, 2015, saying that he would contact him after the weekend.

102.    On May 19, 2015, Sughrue emailed Miller, attaching a statement drafted by his employee, Tracy Moberley, regarding the Dallas Art Fair incident. (Moberly's statement is congruent with Miller's affidavit, and his account herein, and it indicates that the decision to evict Miller was that of the DPD officers.) Sughrue also wrote, "In my ideal world, I would hope there would come a time when we all could experience a more rewarding and enjoyable docent tour of the Art Fair's offering."

103.    On May 20, 2015, Miller replied to Sughrue via email, thanking him his

for the statement, and asking if any member of Sughrue's Dallas Art Fair staff had spoken to Dunn before the DPD officers became involved. Sughrue replied the same day, writing, "Bradley, no one in my office including Tracy talked to Tally [*sic*, i.e. Dunn] before the incident, and Tracy was the point of contact for my staff upon becoming aware of the incident." Miller again replied the same day, thanking Sughrue for his assistance. Miller had no further communications with Defendant Sughrue thereafter.

104. Miller was later informed that, on May 15, 2015, Sughrue had corresponded with Dunn, and—at Dunn's request—had sent a copy of Tracy Moberley's statement to Dunn and her attorney (and Sughrue's own attorney) *before* sending the same statement to Miller. (Sughrue's alleged email is attached as **Exhibit "D".**) Miller was entirely unaware of Sughrue's communications with Dunn at the time, and Sughrue did not inform Miller of his conferences with Dunn.

105. Sughrue's clandestine collaboration with and assistance of Dunn—after Dunn had conspired to violate Miller's First and Fourteenth Amendment rights by causing Miller to be evicted from a public venue by means of a false complaint to law enforcement—make Defendant Sughrue an accessory to Dunn's felonious actions after the fact, in clear violation of 18 U.S.C. § 3.

**Dunn Files Another 330th Family Court Suit, Without Grounds,**

**and Seeks Yet Another Gag Order Against Miller**

106.    Three days after the Dallas Art Fair incident, on April 14, 2015, Dunn filed yet another (custody modification) suit against Miller, this time in the 330th Family District Court. Though grounds are required under Texas Family Code § 156.101, Dunn never pleaded any grounds for filing for modification. Dunn requested that Miller be barred from custody of his daughter, from going near Hockaday, and that Miller be required to undergo a psychological evaluation. Dunn also requested that Miller be enjoined from "[e]ngaging in conduct…that is reasonably likely to harass" or "annoy" Dunn—that is, Dunn was seeking yet another unconstitutional gag order.

### Further Communications With Hockaday – May 2015

107.    On May 8, 2015, Miller again emailed the entire Hockaday Board and members of the media, attaching a copy of his November 9, 2014 email to Mihalopoulos. Miller did so because he did not trust Mihalopoulos to have informed the Board at large of his prior email. Miller attached a transcript excerpt from a 330th Family Court hearing in which Dunn said—in order to establish her credibility—"primarily, I serve as Board Chair at Hockaday." As that date was the 70th Anniversary of VE Day, Miller mentioned a World War II hero and contrasted his actions in confronting abuse with the inaction of Mihalopoulos in allowing Dunn to remain on the Hockaday Board.

108.    On May 12, 2015, Miller was served with a copy of Dunn's 330th

Family Court modification petition. He then learned of Dunn's latest gag order and custody requests. Miller spoke to attorney Bill Brewer of the law firm Bickel & Brewer, the parent of a Hockaday student in Miller's daughter's class; and Brewer arranged to have one of his junior attorneys represent Miller in the first hearing at the discounted rate of $5,000.

109.    On May 13, 2015, Hockaday General Counsel Stuart Bumpas emailed Miller a letter "in response to your recent allegation that The Hockaday School assisted Talley Dunn in violating a court order in enrolling your daughter." Bumpas stated that Hockaday had conducted "an internal investigation" and found that the school had "at no time violated applicable court orders or pertinent legal requirements," and denied any "fiduciary" wrongdoing by the Hockaday Board. Bumpas instructed Miller to address future communications exclusively to Bumpas himself.    The wording of the letter strongly resembled the language of Mihalopoulos' prior emails to Miller.

110.    On May 15, 2015, Miller replied to Bumpus' letter via email, copying the entire Hockaday Board and members of the media. Miller wrote that Bumpas' letter had misstated the wording of his allegation, and reiterated that Hockaday had enrolled his daughter while knowing that a Court Order existed forbidding the move. Miller stated that the "school's leadership and moral compass are both far off-kilter." Miller asserted that that this was not a "divorce" issue; it was "ongoing

case of abuse by a Hockaday Board leader (or two) directed against a Hockaday parent." Miller also described Dunn's abusive actions at the Dallas Art Fair and the contents of Dunn's modification suit. Miller expressed his desire for a change in the Hockaday Board leadership, and said that he would not restrict his communications where his daughter's welfare was concerned.

### Hearings in Dunn's 2015 330th Family Court Modification Suit –

### Another Gag Order imposed on Miller

111. On June 12, 2015, Judge Diaz presided over the first hearing in Dunn's 2015 modification suit. Miller was represented by attorney Mark Millimet of Bickel & Brewer; Dunn was represented by Defendants Rochelle and Findley. At Findley's request—regarding his fear that Miller might be "recording" the hearing—Diaz confiscated Miller's phone and turned it off. Diaz did not require Dunn to surrender her phone. Findley complained about Miller's communications to Hockaday regarding Dunn; Miller's attorney stated that Miller had a First Amendment right to free speech, and that Dunn was just trying to obtain a broad gag order that the 191st Civil District Court had not granted her. At the end of the hearing, Judge Diaz granted Dunn's requested gag order, enjoining Miller from making "disparaging remarks" about Dunn, or any oral or written communications that might "harass" or "annoy" Dunn, or "[c]ommunicating directly to the Hockaday Board Leadership of any third party regarding [Dunn] or any pending

litigation"—in clear violation of the First Amendment. Diaz also enjoined Miller from going within 1000 feet of the Hockaday School or Dunn's house. Millimet called the hearing "a farce." Miller immediately filed a request for de novo hearing on the matter.

112.    Because Miller could no longer afford to pay an attorney, he began representing himself in court; except for brief periods, Miller has proceeded pro se in every case he has been involved in since June 2015.

113.    Because Miller's divorce decree contained a stipulation that he be allowed to attend his daughter's birthday parties, hosted by Dunn at her house, and Judge Diaz's ruling interfered with that right, Miller filed a motion for clarification. Diaz heard Miller's motion on July 9, 2015. Diaz ruled that Miller could not attend the party—in violation of his Fourteenth Amendment right to contract. Though Miller filed a request for a de novo hearing, his daughter's birthday passed before the hearing could be scheduled, and he missed his daughter's 8th birthday party. Dunn has also not allowed Miller to attend any of his daughter's birthday parties since.

114.    On July 23, 2015, Judge Plumlee held a de novo hearing on Judge Diaz's temporary orders. Miller had previously filed and served subpoenas on several witnesses, including Defendants Mihalopoulos, Leyendecker, and Taylor, and artist David Bates. Bates and Mihalopoulos were both represented by Elayna

VERIFIED COMPLAINT                    41

Naftis Erick, the Hockaday alumna who is still a partner in Mihalopoulos' law firm. Judge Plumlee quashed every subpoena except one, on the grounds of "timeliness." Ironically, the one contested subpoena Plumlee did not quash—for Joan Hill, the Head of Lamplighter School—had been served last of all, clearly demonstrating Plumlee's violation of Miller's Fourteenth Amendment right to due process. *See Washington v. Texas*, 388 U.S. 14 (1967). Miller objected to the temporary orders on First and Fourteenth Amendment grounds. But at the end of the hearing, Plumlee reaffirmed Diaz's ruling, and Miller remained gagged.

115.    On July 28, 2015, Dunn filed a *Motion to Compel Removal of Internet Postings*, asking the court to force Miller to remove his prior Facebook comments about Dunn, Miller's recordings of Dunn threatening to divorce him if their daughter did not move to Hockaday immediately, and the deposition video of Chuck Brown.

116.    On September 1, 2015, Associate Judge Diaz issued her ruling on Dunn's *Motion to Compel Removal of Internet Postings*. Defendant Diaz ordered Miller "to immediately remove any information regarding Virginia Talley Dunn or this litigation from any social media outlet, website, blog, newspaper, radio, or YouTube including but not limited to videos, audios [sic], and pictures." Diaz also ruled further that Miller was "prohibited from disseminating to any third party information regarding Virginia Talley Dunn or this litigation for the sole purpose

VERIFIED COMPLAINT              42

of Bradley Briggle Miller or any third party to make any social media posts, statements, create websites, or create blogs [*sic*]." The Associate Judge's ruling, while grammatically opaque, further extended the existing gag order against Miller, in clear violation of his First Amendment rights. Miller immediately filed a request for de novo hearing.

117. On September 17, 2015, Judge Plumlee held a de novo hearing on Dunn's motion to compel removal of Miller's internet postings about Dunn. Over Miller's First Amendment objections, Plumlee once again affirmed Defendant Diaz's ruling—again violating Miller's First Amendment rights. Plumlee seemed to believe that she had the authority to do so.

118. After this hearing, incredulous at his treatment by Diaz and Plumlee, Miller began to research how to file a petition for writ of mandamus in an effort to restore his right to free speech. The effort would consume the vast majority of his time for the following ten months.

### Miller's Appeals Begin

119. On October 23, 2015, Miller filed a *Notice of Intent to File Petition for Writ of Mandamus* in the 330th Family District Court. Miller concurrently filed an affidavit of indigency and requested transcripts of relevant hearings from 330th court reporter Francheska Duffey. The court reporter contested Miller's indigency, and Plumlee sustained the contest on November 2, 2015. As a result, Miller was

VERIFIED COMPLAINT 43

not able to obtain hearing transcripts for his Texas Supreme Court appeal. Miller nonetheless began drafting his mandamus petition and a lengthy affidavit that eventually accompanied it.

120. On March 3, 2016, the Texas 5th District Court of Appeals issued a ruling on Miller's appeal of Judge Ted Akin's Temporary Orders in the Dunn's civil suit against Miller. Fortunately, the 5th District threw out the restrictions on Miller's speech. However—disturbingly—this ruling largely parroted Dunn's false narrative of victimhood, ignored pertinent evidence of Dunn's wrongdoing, and even misstated facts of the case. And, incredibly, the Texas Court of Appeals ruling left in place restrictions on recordings of Miller's conversations that he had made in his own home with a pocket recorder, one of which documented a physical assault by Dunn upon Miller. The ruling also restricted his use of Dunn's text messages to David Bates—which Miller had seen on a phone that was regularly used by both Miller and Dunn—on the spurious grounds that Miller's viewing and photographing these text messages somehow violated the Harmful Access to Computer Act. The 5th District's ruling also affirmed Akin's dismissal of Miller's Anti-SLAPP motion, effectively assisting Dunn in her abuse of Miller's First Amendment rights. But—most distressingly for Miller—though the 5th District justices had restored Miller's right to free speech, their decision was rendered moot by the subsequent gag order imposed by Defendants Diaz and Plumlee, which was

still in effect.

121.   On April 6, 2016, about a month after the Texas appellate decision above was issued, Miller received a package in the mail that contained a CD with several files on it, including the alleged email messages attached hereto as exhibits. Miller was unable to view these files for several days thereafter due to format incompatibilities; after trying several programs, he was finally able to open them using Windows Live Mail.   After reading the first ten messages, Miller was rendered physically ill by the revelation of the Defendants' manipulative and depraved conduct, and he could not bring himself to finish reviewing them for several months.   The email messages include internet header information and appear to be authentic.   The package had no identifying markings.)   Miller was thus informed of the criminally conspiratorial actions of Dunn, Rochelle, Mihalopoulos, and Shugrue; as well as of Leyendecker's libelous statement, and Dunn's trespass, all described above.   Before that date, Miller had no specific knowledge of these acts. (The statute of limitations for fraud is four years. *See* Texas Civ. Prac. & Rem. §16.004(a)(4). **Thus, insofar as the complaints herein regarding these actions pertain to fraud, this suit is timely filed.**)

122.   Miller later learned that Defendant Beth Taylor left the employ of Defendant Dunn under acrimonious circumstances.   Miller tried several times to contact Taylor to ascertain if she knew anything about the origins of the CD Miller

had received containing the email messages described above, or if she could corroborate the contents, but Taylor never answered Miller's phone messages.

123.    On June 30, 2016, after months of constant work, Miller filed a petition for writ of mandamus in the Texas Supreme Court (case #16-0487). Miller requested relief from the 330th Family Court's numerous violations of his constitutional rights. SCOTX denied hearing of Miller's case on October 7, 2016, refusing to address clear evidence of habitual civil rights violations and rampant corruption in the 330th Family Court. (Miller appealed directly to SCOTX instead of state appellate court because Ted Akin had been a 5th District Court of Appeals Justice, and Gena Slaughter was then running for a seat on the 5th District Court of Appeals, so the possibility of bias and corruption was both distinct and repellant.)

124.    Miller then appealed to the United States Supreme Court (case #16-9012), filing his petition for writ of certiorari on March 1, 2017 after five more months of constant, grueling work. SCOTUS also refused to hear the case, eventually denying rehearing on December 2, 2016.

## The 330th Family Court Case Proceeds – More Rights Violations

125.    After more hearings, Dunn's groundless custody modification suit proceeded to trial on October 18, 2016. In her ruling, Defendant Plumlee made the gag order and other restrictions on Miller's parental rights permanent—including (frighteningly) giving Dunn the sole right to determine psychiatric and

psychological care of Miller's daughter. However, Plumlee did eliminate Miller's restriction on speaking to the Hockaday Board.

126. Prior to trial, Miller had filed a motion to recuse Plumlee on grounds of numerous rights violations; in a hearing immediately before trial, Judge T. King Fifer denied Miller's motion to recuse after a perfunctory hearing.

## Miller Removes His Family Court Case to Federal Court;

## Plumlee Signs Final Order Without Jurisdiction

127. A post-trial order entry hearing was scheduled to take place at 9:00 a.m. on November 17, 2016. Miller filed objections to Plumlee's trial rulings two days prior, but he (correctly) suspected that Plumlee would sign the proposed order as written. Miller then decided to remove his case to federal court.

128. Immediately prior to the final order entry hearing in the trial court, Miller removed his case to federal court at 8:27 a.m. on November 17, 2016, citing numerous constitutional violations in the state trial court. Miller filed a Notice of Removal in the state court at 8:57 a.m. on that same day. After Miller filed his removal petition, and prior to remand, state trial court District Judge Andrea Plumlee signed—entirely without jurisdiction—a (void *ab initio*) trial order recording her custody modification ruling. Dunn's attorney, Patricia Rochelle, though served by Miller with the removal documents in the hallway just before the state-court hearing, presented the order to Judge Plumlee anyway. Before walking

VERIFIED COMPLAINT                    47

into the 330th courtroom, Rochelle told Miller, "I'll tell Judge Plumlee you think you have removed the case." Rochelle's office emailed Miller the signed order later that day. Plumlee's holding of a state-court hearing during the pendency of a federal removal and signing an order without jurisdiction violated 28 U.S.C. § 1446. *See also South Carolina v. Moore*, 447 F.2d 1067, 1073 (4th Cir. 1971). Plumlee's act also clearly violated Miller's Fourteenth Amendment right to due process, as well as his First and other Fourteenth Amendment rights described above.

129.     Defendant Rochelle presented an order to state court Judge Plumlee, while fully aware that the state court case had been removed to federal court. Plumlee then signed this order without jurisdiction. Besides imposing the still-extant gag order and other unconstitutional injunctions that are at issue in this suit, this order levied $25,000 in attorney's fees and $517.33 in court costs against Miller, as well as imposing a $15,000 appellate bond requirement. This act violated Texas Penal Code § 32.46 ("Securing Execution of Document By Deception"). (*See Bradley v. Fisher*, 80 U.S. 335 at 351-52 (1871) and its definition of a "purported court").

130.     And because the pecuniary interest involved was greater than $30,000, **Rochelle's act was a third-degree felony**. TPC § 32.46(b)(5). Defendant Findley, who also represented Dunn at the time, and Dunn herself, in whose

interest this act was committed, are also culpable.  Judge Plumlee, who signed this abusive order without jurisdiction, clearly violated 18 U.S.C. §§ 241 and 242, as did Rochelle, Findley, and Dunn.  This act committed by Rochelle, Findley, Dunn and Plumlee also meets the criteria for prosecution for criminal conspiracy under TPC § 15.02.

131.   On November 18, 2016—the very next day—The United States District Court for the Northern District of Texas (NDTX, i.e. this Court), shamefully decided to ignore Miller's constitutional grievances and remanded his case (3:16-CV-3213).

### Miller's Removal Proceeds to the Federal 5th Circuit, then to SCOTUS

132.   Miller's then appealed his case, by right, to the United States Court of Appeals for the Fifth Circuit (case # 16-11817), on December 29, 2016.  After more than seven months of constant work on briefs, the Fifth Circuit again remanded Miller's case on August 17, 2017.

133.   Miller then appealed to The United States Supreme Court (case # 17-6836), filing another petition for writ of certiorari on November 13, 2017—which required another three months of work.  SCOTUS again showed a total disregard for its responsibility to the Constitution, refusing to hear this case as well, and eventually denied rehearing on March 5, 2018.

134.   On January 17, 2018, Miller met with the new Hockaday Head of

School, Karen Warren Coleman, for the first time. Miller introduced himself, explained his situation with Dunn, and gave Coleman a copy of his recent U.S. Supreme Court petition. The meeting was cordial.

## The 330th Family Court Begins Child Support Enforcement Proceedings
## Against Miller, Fails to Notify Him of the Proceedings,
### and Then Orders His Arrest

135.    Meanwhile, as a result of the extensive time commitments required of the Family Court case and related appeals, Miller's income suffered, he ran out of money, and he began to fall behind on child support payments in November 2016. He also lost his rental house in May 2017 due to lack of funds; he was forced to move back in with his elderly parents, in whose care he still assists. Miller's father, who died last November at age 96, had Alzheimer's disease and was wheelchair-bound. Miller's mother is 85 and has several health problems.

136.    Unbeknownst to Miller, on September 13, 2017, at Dunn's request, the Dallas County Domestic Relations Office filed a child-support enforcement action against Miller, Defendant Plumlee issued a show cause order on September 19, 2017 for a hearing on the next day, and Plumlee issued a citation on September 26, 2017. No remand letter had been filed in the state court case subsequent to the remand of Miller's federal appeal (as is required by Texas Rules of Civil Procedure Rule 237a) before Plumlee resumed the case. Further, Miller asserted to the trial

VERIFIED COMPLAINT                    50

court—and again herein asserts—that he was never served with the enforcement citation. Miller was also never notified of subsequent hearings in the 330th Family Court on the enforcement case, all of which were held before Plumlee. Miller was also never notified of subsequent hearings in this action either by the court, by Dunn's attorneys (Defendants Rochelle and Findley), or by the Dallas County Domestic Relations prosecutor.

137.    However, the trial court held an enforcement hearing on January 29, 2018; because Miller was not aware of this hearing, he did not attend, and Defendant Plumlee then issued a capias warrant against him. Miller only learned of this warrant when he went to pick up his daughter for dinner on February 15, 2018. Dunn refused to bring Miller's daughter out to his car. After 80 minutes of waiting, Miller called the police to enforce the custody order. Instead of assisting Miller, Dallas Police notified Miller of the child support capias warrant, arrested him, and took him to county jail, where he remained for approximately 22 hours.

138.    Plumlee thus violated Miller's Fifth and Fourteenth Amendment right to due process, as well his Fourth Amendment right to be free from unreasonable seizure—again without jurisdiction. *See Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306 at 314 (1950).

139.    Miller asserts that Plumlee intentionally neglected to notify him of the enforcement proceedings, and subsequently issued an arrest warrant for Miller, as

an act of retaliation for reporting her constitutional crimes to the authorities, and to higher courts, in clear violation of Texas Penal Code § 36.06.

140.    On February 19, 2018, Miller filed a Motion to Change Venue and a Motion to Recuse Judge Plumlee. In these two pleadings, Miller catalogued numerous instances of abuse, rights violations, and criminal acts committed by both Dunn and Plumlee against him. Miller stated that he had previously warned Judge Plumlee in a pleading that he would "seek federal criminal prosecution of Plumlee under Title 18, U.S. Code §§ 241 and 242" if she signed the allegedly-unconstitutional order of November 17, 2016. Miller also noted that he had previously filed complaints with the Texas State Commission on Judicial Conduct against Judge Plumlee and Associate Judge Diaz. Judge Plumlee refused to recuse herself voluntarily. Miller then had subpoenas issued for Defendants Plumlee and Diaz for Plumlee's subsequent recusal hearing.

141.    On March 5, 2018, Miller filed a Motion to Recuse Regional Presiding Judge Mary Murphy. Judge Murphy had assigned a judge, Kent Sims, to hear the recusal matter. By his own research, Miller discovered that Judge Murphy had previously worked as a name partner in a law firm with attorney Michael Rochelle, the husband of Defendant Patricia Rochelle—which Murphy did not disclose. In response, Judge Murphy recused herself from the case, assigning the case to the Chief Justice of the Texas Supreme Court, Nathan Hecht. Chief Justice Hecht then

assigned the very same judge (Kent Sims) to hear the recusal matter.

### Dunn Files Another Custody Modification Suit Against Miller;

### Findley Threatens Miller With Jail

142.    On March 8, 2018, Dunn filed an amended petition to modify custody. (She apparently filed the original petition the day before.)  Dunn again sought to reduce Miller's custody time of his daughter, and to require that Miller be supervised during visitation.  Attached to her petition was an affidavit in which she recounted Miller's fraudulently-engineered arrest on February 15, 2018, described above.  As usual, Dunn's affidavit twisted facts and posited outright lies in an attempt to make herself appear to be the victim.

143.    On March 8, 2018, at 9:00 a.m., a hearing was held before Defendant Diaz on a motion Dunn had also filed to suspend Miller's visitation (i.e. custody of his daughter).  Miller prepared twenty exhibits and only got two hours of sleep, which was typical of his hearing preparations.  Miller argued that he had removed the case to federal court, and that state court jurisdiction had not been restored by the filing and service of a remand letter, as required by TEX.R.CIV.P. 237a. Defendant Findley said sarcastically, "He removed the case, and believe it or not, it went all the way to the U.S. Supreme Court."  Diaz then asked about Dunn's modification petition and said she wanted to set a date in that modification suit. Miller objected to any proceedings taking place before Plumlee's recusal hearing

had concluded.  Diaz postponed the hearing on Dunn's motion.  Miller then exited the courtroom with Defendants Dunn, Rochelle, and Findley.

144.   On the way out of the courtroom, because he was not previously aware of Dunn's latest modification suit, Miller asked Defendant Findley if he had a copy.  Findley said he had put it in the mail.  Miller told Findley that the suit was void, since jurisdiction had not been reestablished in state court.  Findley said, "You can stop pretending."  Miller said, "I have not been served with anything.  In fact, I have not received any documents from you since November 2016, when you [pointing to Rochelle] gave an order to Judge Plumlee to sign without jurisdiction, and last week."  When Miller said this comment, Rochelle visibly cringed.  Findley said, "You were served."  Miller countered, "I was not."  Defendant Findley then said, "You're going to spend time in jail for failure to pay child support!"  Miller told Findley, "You're going to federal prison for fraud, Findley."

145.   On March 27, 2018, after postponing a March 7 hearing due to Miller's challenge to Judge Murphy, Judge Kent Sims denied Miller's Motion to Recuse Judge Plumlee, and Plumlee remained on his Family Court case.

### Miller Updates Hockaday; Dunn Commits Several Acts
### of Custody Interference; DPD Refuses to Charge Dunn

146.   On March 9, 2018, Miller emailed Hockaday Head of School Karen Coleman and Head of Lower School Randal Rhodus, notifying them of his arrest

on the child support warrant issued by Plumlee at Dunn's request—and because Dunn would not bring their daughter out to his car during his custody period—and also that Dunn had filed yet another custody modification suit against him. Miller again asked Hockaday to "take a more proactive stance in managing what it can in this situation."

147.    On March 29, 2018, Miller filed a Petition for Bill of Review in the 330th Family Court (case # DF-18-06546), alleging fraud and numerous rights violations during his divorce—both on the part of Dunn and trial-court District Judge Andrea Plumlee. In conjunction with this petition, he filed an Affidavit of Indigency, which was uncontested.

148.    Also on March 29, 2018, Miller sent an email to Hockaday General Counsel Stuart Bumpas, attaching copies of Dunn's latest custody modification petition, and demanding that Hockaday cease and desist any involvement in harming him or his family, or in depriving him of his constitutional rights. Bumpas did not respond.

149.    On March 31, 2018, at 6:00 p.m., Dunn refused to bring her daughter out to Miller's car for his court-ordered Thursday night custody period. Miller immediately drove to the police station and filed a report with the Dallas Police Department against Dunn for violating TPC § 25.03 (Custody Interference, DPD incident # 67496-2018). Dunn also withheld Miller's daughter from him during

his possession period and committed custody interference on April 20 (DPD incident # 83355-2018), April 21 (DPD incident # 83869-2018), April 26, (DPD incident # 88039-2018), May 3 (DPD incident # 93521-2018), May 4 (DPD incident # 94473-2018), May 10 (DPD incident # 99320-2018), and May 17 (DPD incident # 105108-2018). (The May 17, 2018 custody interference incident also included the harassment of Miller by two unknown persons in a red car, which swerved diagonally in front of Miller's car as he waited for his daughter in front of Dunn's house. Fearing for his safety, Miller backed away and drove off; he later found out that they were process servers—one of whom falsely claimed in an affidavit on Dunn's behalf (submitted by Rochelle and Findley) that Miller had endangered their safety. Miller filed his own affidavit in the 330th Family Court case, with photographs that clearly demonstrated that the process server was lying.) Miller filed each of these police complaints within minutes of observing the infraction, and while the infraction was still ongoing. **However, the Dallas Police Department refused to arrest or press charges against Dunn for any of these incidents, though each violation of TPC § 25.03 is a state jail felony.**

150.    On April 17, 2018, Miller removed his case to federal court for the second time, once again citing constitutional violations by the 330th Family Court. It was eventually remanded by NDTX on May 16, 2018.

**Dunn Requests Emergency TRO Against Miller; Hockaday Surrenders**

**Miller's Daughter to Dunn During Miller's Custody Period**

151.  On May 17, 2018, Defendant David Findley sent an email stating that he
had scheduled a hearing in the 330th Family Court at 3:00 p.m., and that he would
be presenting an application for an "emergency" Temporary Restraining Order
against Miller.  Miller received the email at around 4:30 p.m.—after the hearing—
so Miller was not able to attend.  Thus Miller did not know if the judge had signed
this spurious order.

152.  On May 17, 2018, at 6:30 p.m., Miller went to Hockaday to pick up his
daughter for his court-ordered Thursday night custody period.  His daughter had
attended a special on-campus event that ended at that time.  Because Miller
suspected that Dunn would attempt to pick up their daughter during his custody
period, Miller emailed Hockaday Middle School Administrative Assistant Wendy
Branson at 10:06 a.m. that morning, saying that his daughter was "to be released
only to me."  Branson replied and indicated that she had forwarded Miller's
message to his daughter's teacher.  When Miller reached the front of the carpool
line at 6:33 p.m. that evening, the remaining students told him that his daughter
wasn't there, and his daughter's teachers told him that Dunn had picked up
Miller's daughter three minutes before.  Miller told teachers Sarah Grip and Eric
Imboden that he had informed the school that he had custody of his daughter, and

that no one else was to be allowed to pick her up. The teachers looked uncomfortable, but did not say anything. Miller then proceeded to the police station to file a TPC § 25.03 complaint against Dunn—the eighth in two months.

153.  On the morning of May 18, 2018, Miller went to Hockaday to participate in Morning Greeters, a program in which 4th Grade parents help their daughters open doors during carpool. Dunn was present and kept her daughter from assisting Miller. Thus Miller opened doors with two other girls whose parents could not attend. Miller did see his daughter walk past him several times. **Miller has not seen his daughter since that date.**

154.  Later on the morning of May 18, 2018, Defendant Findley emailed Miller at 9:29 a.m., attaching a copy of a TRO signed by Defendant Diaz. Diaz's TRO enjoined Miller from "Exercising possession of or access to" his daughter, from "Going within 1000 feet of the Hockaday School for any reason," and from "Attending any of the child's games, practices, and extracurricular activities." As a result of this abusive TRO, and its subsequent extension, Miller and his daughter missed their final Adventure Princesses dad/daughter campout, which they both had always enjoyed immensely over the years. (Dunn had previously kept her daughter from going on this campout in the spring of 2017.)

155.  Diaz's TRO also caused Miller to miss his daughter's 4th Grade graduation ceremony, which took place on the following Monday at Hockaday.

156.    Later on May 18, 2018, Hockaday CFO JT Coats called Miller. Coats told Miller that Hockaday considered Diaz's May 17, 2018 TRO valid and intended to honor it. Coats also said that Hockaday had not received the TRO until the next day, so the teachers were not aware of its existence. Miller asked Coats why his daughter's teachers had allowed his daughter to leave with an unauthorized person; Coats responded to the effect of, "Well, it's hard to keep a child from going when her mother arrives to pick her up." Coats also indicated that she had a copy of Miller's and Dunn's divorce decree, and that she was "relieved" to read that the exchange of possession was designated to occur at Dunn's house. Coats therefore did not feel legally liable for having violated TPC § 25.03, since the change of possession did not occur at Dunn's house. Miller told Coats that Dunn had been engaging in conduct like this for more than five years; and Coats said—twice—"It has been a long ordeal for both of you." Coats apparently saw no irony in her comment.

157.    On the evening of May 18, 2018, having had enough of Dunn's abusive actions in keeping his daughter from him, and Hockaday's assistance of Dunn, Miller sent an email to the parents in his daughter's class notifying them of Diaz's TRO, of Dunn's actions, of the assistance of Dunn by Defendant Mihalopoulos, and of the conduct of Defendant Plumlee and the 330th Family District Court. Miller asked the parents to contact the Hockaday Board to urge the school to cease

its involvement in Dunn's campaign against him, and to "contact the 330th Family District Court to demand an end to their criminal behavior." Several parents reached out to Miller to express their support.

158.    On May 20, 2018, Miller sent a letter to Dallas Police Chief U. Renee Hall regarding the lack of enforcement of TPC § 25.03 by the Dallas Police. Miller described his abuse at the hands of Defendant Dunn, and Dunn's numerous custody violations.    Miller asked Chief Hall to clarify the DPD's stance on enforcement of TPC § 25.03.    Miller also copied Texas Attorney General Ken Paxton, former Dallas Mayor Mike Rawlings, and several members of the local and national media. **DPD chief Hall did not respond.**  Miller also sent a copy of this letter to the FBI, the United States Department of Justice, and former Congressman Pete Sessions.

159.    On May 24, 2018, Miller sent a letter to Hockaday Head of School Karen Coleman regarding the incident on May 17 in which Hockaday allowed Dunn to pick up his daughter from the school campus during his custody period, without his approval, and despite his prior notice to the school about the situation. Miller mentioned Diaz's May 17, 2018 TRO and stated that it was issued without jurisdiction and was therefore void.    Miller expressed his unhappiness that JT Coats had denied wrongdoing on Hockaday's part.    Miller asked Coleman for a face-to-face meeting about the incident; Coleman did not respond.

**Miller Again Removes His Case to Federal Court; Defendant Diaz Holds a**

**Temporary Orders Hearing and Rules Without Jurisdiction**

160.     Because Miller expected Plumlee and Diaz to again violate his constitutional rights in Dunn's latest modification suit, he decided to remove his case to federal court a third time. A temporary orders hearing was scheduled in the 330th Family Court for 9:00 a.m. on June 7, 2018. Prior to the state-court hearing, Miller removed the case to federal Court. Miller filed his removal petition in the United States District Court for the Northern District of Texas at 8:14 a.m. on June 7, 2018 (case # 3:18-CV-1457). Miller then filed a Notice of Case Removal in the state trial court at 8:46 a.m. on that day, i.e. prior to the state-court hearing. At 8:57 a.m. on that same day, Miller personally served Dunn's attorney, Defendant Findley, with the state-court Notice of Case Removal and the federal removal petition, and he informed Findley that the case had been removed to federal court.

161.     Despite the fact that Miller had properly removed the case, Defendants Diaz and Findley proceeded with the temporary orders hearing; Judge Diaz then issued a default judgment against Miller, and signed the temporary orders without jurisdiction at 9:37 a.m. on June 7, 2018. These temporary orders bar Miller from custody of or access to his daughter, prohibit Miller from going within 1000 feet of Hockaday, and enjoin Miller from attending his daughter's extracurricular activities. The temporary orders also require Miller to undergo a psychological

evaluation. The orders also require Miller to pay a fee to a supervised visitation center if he wishes to see his daughter. (The visitation center, Hanna's House in Dallas, Texas, requires a registration fee of $60, and an hourly fee of $60 for visitation. Miller could afford neither; nor did he wish to fund a fraudulent, abusive, terroristic conspiracy by paying these fees.) **As a result of these injunctions, Miller has not seen or spoken to his daughter since May 2018.**

162. Defendants Diaz and Findley thus again clearly violated Miller's Fourteenth Amendment due process and parental rights.

163. Further, because Diaz's illicit "order"—signed without jurisdiction—resulted in financial harm to Miller; and because Miller was forced to spend more than a year fighting it, costing him time and income, Defendant Findley's submission of this order to Diaz violated TPC § 32.46. In effecting the signing of this fraudulent order, Associate Judge Diaz, Dunn, Findley, and Rochelle all violated 18 U.S.C. §§ 241 and 242 and TPC § 15.02 ("Criminal Conspiracy").

164. As Miller left Diaz's courtroom on June 7, 2018 after serving Defendant Findley with his removal documents, a Dallas County Sherriff's deputy served Miller with the child support enforcement citation. This service occurred while the case was in federal jurisdiction and was thus void; however, the fact that service of this citation was attempted on that date strongly indicates that Miller was not served previously with this document.

165.    On June 12, 2018, in an attempt to force the state court to recognize federal jurisdiction, Miller filed a Special Appearance in the 330th Family Court. Miller's Special Appearance was denied by both Defendants Diaz and Plumlee. Also on June 12, 2018, Miller filed a request for de novo hearing on Diaz's Temporary Orders; even this statutorily-required de novo hearing was denied (on August 21, 2018, by Defendant Plumlee)—again violating Miller's Fourteenth Amendment rights. Miller filed an objection to the denial of his request for de novo hearing on August 24, 2018.

166.    Miller's federal removal proceeded to the United States Court of Appeals for the Fifth Circuit (case # 18-10897), where rehearing was eventually denied on December 17, 2018. Prior to that date, jurisdiction over Miller's Family Court case remained in federal court. The briefing in that appeal required three more months of constant work; this time, the Fifth Circuit illegally dismissed the case before briefing was complete. (Rochelle's husband, Michael R. Rochelle, Texas bar card # 17126700, improperly filed a motion to Dismiss on Dunn's behalf, and the Fifth Circuit inexplicably granted it.)

167.    Miller also took that appeal to The United States Supreme Court (case # 18-7450) filing a petition for writ of certiorari on April 2, 2019—after three more months of work. SCOTUS once again refused to observe its constitutional duty, and refused to hear Miller's case, eventually denying rehearing on April 29, 2019.

**Miller Attempts to Confer With Dunn and Her Lawyers**

**To See His Daughter Again**

168.    On June 26, 2018, Judge Plumlee held a de novo hearing on Miller's Special Appearance. Only Defendant Rochelle appeared for Dunn that day; Dunn was not present. Plumlee refused to grant Miller's Special appearance, refusing to recognize federal jurisdiction despite clear evidence that Miller had removed his case to federal court.

169.    As Miller left the courtroom, he asked Rochelle if they could speak outside. Miller and Rochelle sat down in the lounge area outside Plumlee's courtroom. Miller asked Rochelle, "What can we do to resolve this? I would like to see my daughter." Rochelle said, "Well, Mr. Miller, you are 99 percent to blame." Miller replied, "I understand that you perceive that to be the case." Strangely, Miller's response seemed to satisfy Rochelle. Miller continued, "But your client [i.e. Dunn] began this case with false allegations that resulted in my having a 5-month supervision requirement." Rochelle smirked and said, "That was good." Miller then asked Rochelle if she had children; Rochelle said she did. Miller asked Rochelle if she thought it was important for her to see her children; Rochelle replied that she did, but that she wasn't the subject of the case. Miller then asked Rochelle to talk to Dunn about a settlement; Rochelle said she would contact her client and get back in touch with Miller. Rochelle never contacted

Miller thereafter. Observing Rochelle during this conference, and her lack of empathy and normal emotions, Miller concluded that Rochelle is a psychopath.

170. On July 16, 2018, Miller, Dunn, Rochelle, and Findley appeared in Plumlee's courtroom for a conference to set a de novo hearing date on Diaz's temporary orders. Judge Plumlee was away, so Diaz postponed the conference. Miller had brought a friend along, attorney Jim Alderson, in the hope that Alderson might be able to reason with Dunn, since Alderson had known Dunn for several years. Miller, Alderson, Dunn, Rochelle, and Findley then proceeded to the lounge area outside the courtroom. Dunn began speaking to Alderson, and Miller and Findley sat down to confer. Miller asked Findley, "What can we do to resolve this situation?" Findley said, "Well, first, you have to pay your child support." Miller said, "Your client's constant suits are taking up all of my time. Each hearing takes days of preparation, and I don't have a lawyer. That is affecting my income." Findley gestured to a stack of documents in Miller's lap and said, "You don't have to do all that work for a hearing." Miller countered, "You know that you have to be prepared for every eventuality in a Family Court hearing, and that takes time." Miller also said that he was taking care of his elderly parents as well. Findley said, "Well, Mr. Miller, you need to understand the difference between a moral responsibility and a legal obligation." Miller found Findley's comment highly ironic, considering that Miller had personally observed Findley making false

statements of material fact in court, and suborning perjury from Dunn. Findley, however, said that he would talk to Dunn and get back in touch with Miller. The conference seemed productive, but Findley never did contact Miller regarding a resolution.

171. As Miller conferred with Findley that day, he observed Dunn speaking with attorney Jim Alderson. Both were standing about twelve feet away. Dunn was speaking constantly in an animated fashion, rarely allowing Alderson to talk. Dunn's hands were clenched into fists at her sides, and her face was red and contorted with rage. The conversation between Dunn and Alderson went on in this manner for around ten minutes. Rochelle stood closer to Miller and Findley, and never said anything.

172. As Miller left the courthouse with Alderson, Alderson told Miller (regarding Dunn), "Well, she's really angry, and she's absolutely convinced that she's the victim." Alderson continued, "And she says you're bankrupting her by suing her all the time." Miller told Alderson that Dunn had sued him six times, and Miller had only filed appeals related to Dunn's constant suits. Thus Dunn's perception of her victimhood was a persecutory delusion. Miller also noted that Dunn had taken his home and all of his assets, and her constant suits were making it impossible for him to do anything but legal work. Alderson subsequently tried once more to confer with Rochelle and Findley, without success.

### The 330th Family Court Enforcement Case Against Miller Proceeds

173.    Despite the fact that jurisdiction had not been established, and Miller had never been properly served with the citation, the child-support enforcement case against Miller proceeded in the 330th Family District Court (still in case # DF-13-02616). Judge Plumlee held a rights hearing on August 8, 2018; Miller was found indigent and assigned a court-appointed attorney.

### Conference Between Miller and Hockaday Head of School;

### Hockaday Allows Dunn to Chair Fundraising Event

174.    On March 24, 2018, Hockaday held its annual fundraising benefit dinner and auction. Despite Dunn's conduct, and the fact that Miller had kept the school informed of his situation, Hockaday allowed Dunn to chair the benefit event.

175.    On September 13, 2018, Miller participated in a telephone conference with Hockaday Head of School Karen Coleman and Chief Financial Officer JT Coats. Miller informed Coleman and Coats that his appeal of Diaz's temporary orders—which were keeping him both from his daughter and from Hockaday—was pending in the Texas 5th District Court of Appeals. Miller asked Coleman if Hockaday had a policy in place to deal with Parental Alienation—defined as "an inappropriate alliance between one parent and a child against the other parent that undermines the executive functions and authority of the parental subsystem"; Coleman stated that the school did not. Miller also brought up the fact that, in the

Hockaday *2017-2018 Annual Report of Gifts*, on page 52, Dunn was pictured standing next to Coleman and just one other person in a posed, full-page photograph. [Photo attached as **Exhibit "E"**. Dunn is pictured at left; Coleman at center.] Miller asked Coleman if the photo in the Annual Report—which is mailed to every member of the Hockaday community—indicated Hockaday's or Coleman's endorsement of Dunn and her actions. Coleman responded that she had not intended for the photo to be seen as an endorsement. Miller replied that it looked that way to him, and probably to others. Finally, Miller asked if Hockaday were doing anything to improve his situation with regard to being kept from his daughter, especially since two prior Hockaday Board Chairs had illegally engineered it. Coleman said that the school was not taking any special action.

176.    In the Hockaday *2016-2017 Annual Report of Gifts*, Coleman wrote (on page 7) that the school's Centennial Campaign raised \$100 million for Hockaday. **That Hockaday fundraising campaign was chaired by none other than Defendant Mihalopoulos.** On page 27 of the same publication, Dunn is listed under The 1913 Society, which "recognizes supporters of Hockaday who have notified us that they have made a provision for the school in their estate plans." Hockaday would thus stand to benefit from assets that Dunn defrauded from Miller.

177.    On August 17, 2018, Miller emailed Hockaday Head of School Coleman

and Head of Middle School Linda Kramer, since Miller's daughter was then entering 5th Grade. Miller updated them on the status of his court case, and indicated that he had not seen his daughter since the prior May. Miller indicated that he was working to overturn Diaz's fraudulent Temporary Orders in a federal appeal (5th Circuit case # 18-10897). Miller further asked them "to confront Dunn about her actions, and to write the 330th Family District Court regarding Hockaday's stance on these proceedings and Dunn's behavior." To Miller's knowledge, neither occurred. Linda Kramer wrote Miller back on August 20, 2018 and asked him to notify her of any developments.

178. On August 21, 2018, Hockaday Chief Financial Officer JT Coats sent Miller a letter notifying him of the school's intention to observe and enforce Defendant Diaz's fraudulent Temporary Orders. Coats wrote, "…you are prohibited from attending any events on the Hockaday campus or any of [your daughter's] school-related extracurricular or social activities off campus as per the TRO." Coats further stated, "If you choose to violate School policy and the court orders through your attendance at a prohibited event, you will be asked to leave and may be given a criminal trespass warning if you refuse."

179. Dunn, Rochelle, and Findley had sent Hockaday a copy of Diaz's fraudulent June 7, 2018 Temporary Orders, falsely claiming that these orders were legitimate. Hockaday then acted on these orders as if they were issued by a

legitimate court—while fully aware that they were not. Dunn, Rochelle, and Findley thus violated TPC § 32.48, and Hockaday conspired in this act by intentionally recognizing this fraudulent document as legitimate.

180. On August, 21, 2018, at a hearing before Judge Plumlee, Defendant Plumlee denied Miller's request for de novo hearing on Defendant Diaz's fraudulent Temporary Orders. (Miller had previously filed a Special Appearance to challenge state-court jurisdiction, which Diaz also denied.) Miller had timely filed his de novo request, and had made multiple attempts to schedule a hearing, all of which were thwarted by Plumlee's Court Coordinator, Rita Bartley. Plumlee thus violated TEX. FAM. CODE § 201.015 (f) and Miller's Due Process rights. Diaz's fraudulent Temporary Orders thus remain in effect to this day.

181. On August 24, 2018, Miller replied to Hockaday's letter via email. In his reply, Miller stated that he "cannot condone Hockaday's continuing, silent participation in what is—by any standard—a horrific instance of child abuse. Is there no one in the entire Hockaday administration who has the integrity and fortitude to stand up and say, 'This is wrong'?"

**Plumlee Holds Miller's Enforcement Trial in the 330th Family Court**

182. Judge Plumlee presided over Miller's enforcement trial on October 22, 2018. At trial, Dallas County Domestic Relations Prosecutor Matthew Garcia (Texas Bar card # 07639380) and Plumlee falsely construed a $203 computer part

as a multi-million-dollar property, supposedly owned by Miller; and Plumlee then cited that nonexistent property in its ruling that Miller had the ability to pay. Despite Miller's clearly demonstrated indigency—and the well-documented fact that Plumlee herself was largely responsible for Miller's financial straits, Plumlee found Miller guilty of "willful contempt" for nonpayment of child support. Before delivering her ruling, Plumlee perversely told Miller, "You choose not to work for whatever your reason is. You choose to spend your time doing other things that are inconsistent with being a good parent for your daughter." Plumlee also proclaimed that Miller was "intentionally…violating this court's order."

183.    Plumlee imposed community supervision (i.e. probation) for 10 years at a cost of $25 per month, and levied a $500 fine for court costs against Miller. Miller was further ordered to pay a lump-sum payment of $2,500, surrender an additional $1,500 in bond funds (from his unlawful February 2018 arrest), and to pay $14,199.61 in child support arrearages. Plumlee also ordered Miller committed to jail for 179 days on each of four counts of contempt, with the sentences to run consecutively (i.e. 716 days total, or almost two years). The sentence was suspended on condition of payment of $2,500, reporting to community supervision, and giving future employers a copy of the court's wage withholding order. Plumlee also ruled that Miller was "intentionally under-employed," that he "could have timely paid the above specified child support in

full," and that he "has the ability to comply with the order of the Court by paying the child-support arrearage set forth herein [i.e. in the court order]." The trial court ruling and order made no mention of Miller's perpetually time-consuming defensive legal work, or the Plumlee's role in illicitly imposing that burden upon him. Further, Plumlee's levying of court fines and attorney's fees against Miller violated his Eighth and Fourteenth Amendment rights. *See Timbs v. Indiana*, 586 U.S. ___ (2019); *Campbell v. Wilder*, 487 S.W.3d 146 at 151-152 (Tex. 2016); *Equitable Gen. Ins. Co. v. Yates*, 684 S.W.2d 669 at 671 (Tex. 1984); *Bearden v. Georgia*, 461 U.S. 660 at 671 (1983).

184.    Between the trial court's initial ruling at trial on October 22, 2018 and the eventual final ruling from the bench, Miller spent approximately two and a half hours in handcuffs while he was coerced into calling family members to come up with $2,500 cash. A Dallas County sheriff's deputy sat next to him in a conference room, filling out Miller's jail intake forms. The deputy and trial court bailiff suggested that it would take $5,000 to keep him out of jail. Eventually, Miller's 84-year-old mother—emotionally distraught and unable to produce $5,000 cash— arranged to have $2,500 brought to the courthouse.

**Hockaday Continues to Enforce Diaz's Fraudulent Orders Against Miller**

185.    On November 29, 2018, Miller emailed Hockaday Head of School Karen Coleman and CFO JT Coats, stating that he wished to attend his daughter's

5th Grade "Parent Pop-In Day" the next day. Miller also copied Hockaday general counsel Stuart Bumpas. Miller attached a copy of his *Petition for Rehearing En Banc* from his then-pending federal 5th Circuit appeal (case # 18-10897). Miller then cited federal cases from that Petition—including *South Carolina v. Moore*, *Ackerman v. Exxon Mobil*, and *Polyplastics, Inc. v. Transconex*—which held that state-court proceedings during a federal removal are automatically void, and that a court declaration is not required to demonstrate that they are void. Miller stated that the Temporary Orders signed by Defendant Diaz, which kept Miller from going to Hockaday, were "null and void." Miller asked Coleman and Coats to acknowledge that Diaz's temporary orders were void, and assure him that, if he were to attend the event at Hockaday, that the school would not attempt to enforce Diaz's orders. Miller further stated, "I will take any effort to cooperate in the enforcement of this so-called 'court order' as a violation of my constitutional rights, and thus as violations of Title 18, U.S. Code 241 and 242, which are actionable under 42 U.S. Code 1983. I would hope that Hockaday would willingly observe and follow federal law."

186.    Later on November 29, 2018, Hockaday CFO JT Coats replied via email, saying, "We will continue with the protocols described in the August 21 letter until we receive an order rescinding the current TRO." Thus Hockaday stuck by its decision to recognize Defendant Diaz's fraudulent Temporary Orders

as legitimate, and to thereby bar Miller from the Hockaday campus.

187.    Late that same night, on November 30, 2018, Miller replied to Coats' email, once again clarifying that "the 330th Family Court is void even in the absence of a declaratory judgment by any court." Miller further stated, "Hockaday is, in fact, by observing this order, making a determination about its supposed legality." Miller missed his daughter's Parent Pop-In Day event, while the other parents of girls in the class were allowed to attend.

## Miller Appeals Plumlee's Enforcement Ruling; More Legal Work Required

188.    Plumlee eventually issued her written enforcement ruling on January 14, 2019. Miller filed an appeal on February 14, 2019; that case (05-19-00197-CV) remains pending in the Texas 5th District Court of Appeals.    That appeal complains of many of the same constitutional violations described herein. Upon Miller's motion, the 5th District COA stayed Miller's community supervision and associated fees during the pendency of the appeal.

189.    Miller spent the next four months drafting his Brief of Appellant, which he filed on June 28, 2019. He also subsequently had to draft a Reply Brief, filed on September 10, 2019. The 5th District Court of Appeals shockingly denied Miller's initial request for preliminary relief, in which he requested that his November 2016 gag order and the June 2018 temporary orders be vacated, so his constitutional rights remain violated to this day.

### Dunn Refuses to Let Miller Communicate with His Daughter,

### or Even to Inform Him of His Daughter's Welfare

190.     On October 20, 2019, Miller's residence and entire neighborhood were struck by the tornado that devastated much of Dallas. Miller and his parents were uninjured, but their house was damaged. In the chaos afterwards, while helping elder residents reach family members at the other end of a debris-strewn street, Miller learned that the tornado had also passed near Dunn's house—where his daughter lives. Miller immediately texted Dunn and asked if his daughter were ok. Dunn did not respond.

191.     Miller has texted Dunn several times over the past two years, asking about his daughter. Dunn has not responded since May 13, 2018.

192.     Miller calls his daughter every night in an attempt to speak to her. Miller calls his daughter's cell phone, Dunn's cell phone, and Dunn's home phone. Besides one occasion on September 28, 2019, when his daughter briefly answered and then hung up immediately, and another occasion on March 21, 2020 when Dunn answered and then hung up when Miller asked to speak to his daughter, Dunn and Miller's daughter have not answered Miller's phone calls since before May 2018. Thus Miller has not spoken to his daughter for almost two years.

### Further Communications Between Miller and Hockaday;

### Dunn Is Allowed to Host a 2019 Hockaday Benefit Event

VERIFIED COMPLAINT              75

193. On October 31, 2019, while going through some unopened mail, Miller noticed that he had received a Hockaday "Special Occasions" brochure listing various fundraising events being held during the 2019-2020 school year. On a full page of this color brochure was a listing for an event hosted by Dunn at her art gallery on November 2, 2019. At the top of the page was a color photo of the front of Dunn's gallery. The listing also mentioned that Hockaday teacher Sabrina Kessee would be performing, along with Hockaday alumna Ivy Avino '08. Miller immediately emailed Hockaday Head of School Karen Coleman and requested a conference.

194. On November 1, 2019, Miller participated in a telephone conference with Hockaday Head of School Karen Coleman and Head of Middle School Linda Kramer. Miller updated Coleman and Kramer on the status of his pending 5th District appeal. Miller then mentioned Dunn's event in the Hockaday brochure. Miller stated that allowing Dunn to host a Hockaday fundraising event looked like an endorsement of Dunn and her actions by Hockaday, and was grossly inappropriate under the circumstances. Miller also said it looked as if Hockaday were willing to turn a blind eye to Dunn's conduct as long as the school benefited financially. Coleman said that the school would never base such a decision on financial considerations. Miller then asked Coleman who approved the event, and Dunn's sponsorship. Coleman said that, though the school sent out the brochure,

VERIFIED COMPLAINT 76

the administration did not vet the events. Miller replied, "Don't you think you should?" His question was met with silence.

### Consequences of the Actions of the Defendants' Actions;

### Miller's Texas Court of Appeals Case Is Submitted to Panel

195.    On November 30, 2019, it became obvious that Miller's father's health had taken a turn for the worse. At 6:14 p.m., Miller texted Dunn, saying, "V's grandfather is in hospice and does not have long to live. I would like V to come see him tonight." Dunn did not respond.

196.    On November 30, 2019, at around 6:18 p.m., Miller's father, Robert Miller, died of pneumonia at the age of 96. Due to the actions of Defendants Dunn, Rochelle, Findley, Plumlee, and Diaz, the elder Mr. Miller did not see his only grandchild (i.e. Miller's daughter)—whom he loved dearly, and called "Pumpkin" and "Little Bit"—for the last year and a half of his life.

197.    On December 3, 2019, Miller emailed Dunn, notifying her of the date and location of his father's funeral, and saying that the family expected his daughter to attend. Miller copied Defendants Rochelle, Findley, Plumlee, and Diaz on the email. Dunn did not respond. Miller's daughter did not attend her grandfather's funeral.

198.    Also on December 3, 2019, Miller posted a comment to the Hockaday Class of 2026 Facebook page, which is an informal forum for parents in Miller's

daughter's Hockaday class.   Miller noted the date and time of his father's funeral, and included a link to an obituary that ran on the front page of the *Dallas Morning News*.   Miller also wrote, "If any of you might have any influence, please encourage [Miller's daughter] to attend."   A few parents responded with condolences.   When Miller checked the next day, his post had been deleted.

199.   On January 18, 2020, Miller spoke with Dallas District Attorney John Creuzot by telephone.   Miller had read a *Dallas Morning News* article about Creuzot's prosecution for violating a gag order in the Amber Guyger/Botham John case, in which Creuzot was quoted as saying he would challenge any gag order issued by a Dallas County judge.   In a pleasant 10-minute conversation with Creuzot, Miller said that he had been under a gag order issued by Plumlee for five years.   Miller told Creuzot that Plumlee had signed the order without jurisdiction and thus had no immunity.   Miller said that the only way judges would stop issuing illegal orders is if they were prosecuted.   Creuzot told Miller, "Nobody's gonna take that case."   Creuzot did not explain why he would not prosecute a judge for a crime of this nature.   Creuzot told Miller, "You should scrape some money together and hire a lawyer."   Miller told Creuzot that he did not have money to pay a lawyer.   In a follow-up email, Miller wrote to Creuzot, "A legal system that 1) doesn't follow the law and 2) requires the payment of a cash tribute to lawyers in order to achieve justice is not acceptable to me.   Nor do I believe it is it acceptable

to the American public." Creuzot did not respond.

200.    On January 21, 2020, the Texas 5th District Court of Appeals set Miller's appeal for submission to a panel on February 19, 2020. One of the 5th District COA Justices empaneled was Ken Molberg. Miller filed a motion to recuse Justice Molberg on the grounds that, in 2015, Molberg had deleted a comment Miller made on Molberg's campaign Facebook page regarding Family Court corruption, and then blocked Miller from commenting on his page. The 5th District COA granted Miller's motion, and Molberg was recused.

201.    On January 27, 2020, Miller filed a second request for oral argument in his Texas 5th District Court of Appeals case. Miller wrote, "...oral argument would provide an indispensable opportunity for member[s] of the public—and especially members of the media—to witness firsthand the mechanism of judicial corruption, and how extensive Family Court fraud is in our country." The 5th District COA denied Miller's request. There would be no public hearing.

202.    On March 26, 2020, the 5th District COA issued an opinion in case # 05-19-00197-CV, ruling against Miller on all issues related to the child support enforcement contempt judgment, ignoring federal and state precedent on indigency and fines. Even more shockingly, the 5th District ruling falsely claimed that it had no jurisdiction over Miller's mandamus appeal of Plumlee's November 17, 2016 gag order because it was not filed within "thirty days" of the judgment. There is

no time limit for mandamus—which is why mandamus exists. (*See CMH Homes v. Perez*, 340 S.W.3d 444, 454 (Tex. 2011)). Worst of all, the 5th District COA completely ignored Miller's appeal of Diaz's fraudulent June 7, 2018 temporary orders—which are still keeping Miller from seeing his daughter—and simply pretended Miller didn't even mention Diaz's orders in his appeal. The 5th District COA ruling also made absolutely no mention of the egregiously abusive conduct by both Dunn and Plumlee.

203.    Observing these events as a whole, it is evident that the Dallas County court system has become a criminal enterprise, with the officers and professionals in control thereof manifestly abusing process and law in a concerted campaign to harass and abuse Plaintiff Miller—and, no doubt, many like him. The Defendants herein have generally engaged in so much crime, committed so often, and with such persistence, that it conclusively shocks the conscience of any reasonable person. (Indeed, upon belief and information, Plaintiffs have sufficient cause for official investigations into patterns and practices of widespread, systemic violations of basic federal constitutional rights by the 330th Family District Court, and by the Dallas County court system as a whole.)

204.    All Defendants have proximately caused the Plaintiff to suffer deprivation of substantive due process, equal protection rights, privileges and/or immunities secured by the Constitution and/or laws of the United States, and

substantive rights, privileges or immunities secured by the Constitution of the United States, the Constitution of the State of Texas, and the laws of the State of Texas, by their interferences with the rights of the Plaintiff; and the acts and omissions of and by all Defendants have violated clearly established laws, rules, and regulations.

205.    The acts, commissions and/or omissions of all Defendants in this case were performed under color of law and deprived Plaintiff Miller of his First, Fourth, Fifth, Eighth, and Fourteenth Amendment rights under the United States Constitution to freedom of speech and assembly, due process, freedom from unreasonable seizure, freedom from excessive fines, and freedom from interference with his fundamental right to parent his child, without cause and without due process of law.

206.    The acts and omissions of all individual Defendants were maliciously, intentionally, knowingly and willfully designed to deprive Plaintiff Miller of his rights, privileges and immunities.

207.    The acts and omissions of all individual Defendants were so gross and culpable in nature that they constitute malice, reckless indifference and/or wanton disregard for law and the rights, life, liberty and property of Plaintiff Miller, thereby entitling Plaintiff to punitive damages. The recovery of punitive damages is permitted under the federal civil rights statutes for reckless and callous

indifference to federally protected rights of others, and is thus appropriate in this case.

## The Defendants Have No Immunity From Suit

208.  In the constitutional republic of the United States of America, no one is above the law; there is no form of nobility whatsoever; and therefore there is no such thing as immunity to law. *See* U.S. CONST, ARTICLE I, § 10.

209.  Further, because Defendant Diaz's signing of the June 7, 2018 Temporary Orders was done without jurisdiction, and Defendant Plumlee's signing of the November 17, 2016 post-trial order was done without jurisdiction, neither Diaz nor Plumlee have any immunity whatsoever from civil suit because their acts were not done in their official capacity.  Judges are deemed to be "liable to civil actions" for "acts done by them in the clear absence of all jurisdiction over the subject matter." *Bradley v. Fisher*, 80 U.S. 335 at 351 (1871).  See also *Stump v. Sparkman*, 435 U.S. 349 at 356-357, 360 (1978).  Further, a judge "is not immune from liability for nonjudicial actions, i.e., actions not taken in the judge's judicial capacity," and "a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction." *Mireles v. Waco*, 502 U.S. 9 at 11-12 (1991).  At the time of both hearings, the trial court proceeded while having "clearly no jurisdiction over the subject matter" and with "usurped authority"; thus "no excuse is permissible." *Bradley v. Fisher* at 351-352.  Therefore, Judge Diaz

has no immunity regarding her signing of the temporary orders, Judge Plumlee has no immunity regarding her signing of the custody modification suit order, and both are answerable to civil damages under 42 U.S.C. § 1983.

210.  Further, judges are not immune from liability regarding recovery of attorney's fees in suits that seek relief regarding acts "clearly in excess" of their jurisdiction—or even regarding unconstitutional acts done in their judicial capacity. *See* 42 U.S.C. § 1988; *Pulliam v. Allen*, 466 U.S. 522.

**Because the Conspiracy Against Miller Is Ongoing, and the**

**Resulting Harm to Him Persists, Any Statute of Limitations**

**for Specific Acts Should Not Apply**

211.  As Plaintiff Miller has described herein, the acts committed by the Defendants have all been part of an ongoing conspiracy to harm him and deprive him of his rights.  As a result, he is still under a gag order—requested by Dunn, Rochelle, and Findley, and issued by Plumlee—that has been in effect for five years.  As a result of the fraudulent June 2018 Temporary Orders issued by Diaz, Miller has not seen his daughter for almost two years.  Miller has been forced to dedicate the past seven years of his life almost exclusively to fighting the effects of these abusive actions in court, further depriving him of time and a substantial amount of money.  This conspiracy persists to this day, as clearly shown by Miller's pending Texas 5th District appeal, and indeed by this very complaint.  The

harm to Miller also persists to this day. Thus in the interest of Due Process, the statute of limitations for any specific act cited herein should not apply, and the effective tolling date should be the present day.

212.     The Defendants have kept Miller tied up in constant, endless court activity since at least 2015, and he has not had the money (ever), time, or expertise to file this complaint until now. The Defendants should not be rewarded for abusing legal process in an effort to run the statute of limitations for their criminal and malicious acts, as such would clearly violate Plaintiff Miller's Due Process rights.

213.     As Miller indicated above, the Texas statute of limitations for fraud is four years. *See* Texas Civ. Prac. & Rem. §16.004(a)(4). Miller was informed of the criminally conspiratorial actions of Dunn, Mihalopoulos, and Shugrue; as well of as Leyendecker's libelous statement, and Dunn's trespass, on April 6, 2016. Thus, insofar as the complaints herein regarding those specific acts pertain to fraud, this suit is timely filed regardless of any other pertinent limitations.

## LEGAL LIABITY

## COUNT I – FIRST AMENDMENT VIOLATIONS OF RIGHTS TO FREE SPEECH AND ASSEMBLY  [ALL DEFENDANTS]

214.     Plaintiff incorporates all paragraphs *supra* into this Count.

215.     The First Amendment unequivocally guarantees the rights to free speech and free assembly. Defendants Dunn, Rochelle, Findley, Plumlee, and Diaz have conspired almost since the outset of Dunn's divorce suit in 2013 to deprive Miller of his right to speak without prior restraint and his freedom of movement.

216.     At the request of Dunn, Rochelle, and Findley, Defendant Plumlee imposed a gag order against Miller during his 2013-2014 divorce case.

217.     At the request of Dunn, Rochelle, and Findley, Defendants Diaz and Plumlee imposed a gag order against Miller during Dunn's 2015 custody modification suit. Defendant Plumlee made this gag order permanent in her ruling from the bench in that suit, and also in her fraudulent November 17, 2016 post-trial final orders—an act for which Plumlee has no immunity.

218.     At the request of Dunn, Rochelle, and Findley, during Dunn's 2015 custody modification suit, Defendants Diaz and Plumlee forced Miller to remove Facebook comments and other internet postings he had made, and enjoined him from restoring these postings. Defendant Plumlee made this gag order permanent in her ruling from the bench in that suit, and also in her fraudulent November 17, 2016 post-trial final orders, which were signed without jurisdiction.

219.     At the direct instigation of Defendant Mihalopoulos, Defendants Dunn, Rochelle, and Findley filed suit against Miller for custody modification in 2015 and requested these unconstitutional gag orders. As a result, Plaintiff Miller has

been illegally gagged—under clearly credible threat of jail and fines—for five years. The timing of Mihalopoulos' instigation also strongly suggests that she was involved in Dunn's request for a gag order in Dunn's 2015 191st Civil District Court suit against Miller, which also resulted in his being illegally gagged.

220.    At the request of Dunn, Rochelle, and Findley, during Dunn's 2015 modification suit, Defendant Diaz issued Temporary Orders on June 12, 2015 keeping Miller from going within 1000 feet of the Hockaday School or Dunn's residence. Defendant Plumlee made these restrictions on Miller permanent in her trial ruling, and (with the exception of the Hockaday distance limitation) in her fraudulent November 17, 2016 post-trial final order. These orders clearly violate Miller's First Amendment right to freedom of assembly.

221.    At the request of Defendants Dunn, Leyendecker and Taylor, on April 11, 2015, Defendants Keller and Darnell improperly removed Plaintiff Miller from a public venue on their own initiative—even after determining that Miller was not subject to a restraining order, and thus that they did not have probable cause to do so. Defendant Sughrue conspired in this act after the fact.

222.    At the request of Dunn, Rochelle, and Findley, during Dunn's pending custody modification suit, Defendant Diaz issued fraudulent Temporary Orders on June 7, 2018 keeping Miller from going within 1000 feet of the Hockaday School. Defendant Plumlee then affirmed Defendant Diaz's orders. These orders clearly

violate Miller's First Amendment right to freedom of assembly.

223.    The County is liable under § 1983 for the violation of Plaintiff Miller's rights because the need for more or different judicial training here is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the County can reasonably be said to have been deliberately indifferent to the need. The County's inadequate training and supervision caused, or contributed to causing, Defendants Diaz and Plumlee to intentionally commit acts, acting under color of law, that violated Miller's First Amendment rights. *Connick v. Thompson*, 563 U.S. 51, 63-64 (2011); *City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989). Repeated violations of individuals' civil rights is the predictable consequence of the County's failure to train judges regarding the Constitutional limitations on punishing the common scenario of allegedly derogatory statements being posted on social media, or made orally or in writing.

224.    The City of Dallas is liable under § 1983 for the violation of Plaintiff Miller's rights because the need for more or different police training here is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the City can reasonably be said to have been deliberately indifferent to the need. Officer Keller and Officer Darnell's conduct is the product of the City's failure to train officers or remedy problems in the face of repeated incidents where the City's officers, agents or both, acting under color of law, intentionally deprived

VERIFIED COMPLAINT                    87

citizens of constitutional rights. (The refusal of the Dallas Police Department to discipline its officers for their actions after a thorough Internal Affairs investigation only serves to emphasize the City's deficiency.) This inaction on the City's part constitutes deliberate indifference to civil rights and rises to the level of a custom or policy.

225. As a direct and proximate result of all Defendants' actions, and the City's and County's wrongful conduct, Plaintiff Miller suffered unlawful treatment, anguish, embarrassment, humiliation, stress, and anxiety, and will continue to suffer damages.

## COUNT II – FOURTH AMENDMENT VIOLATIONS

## [ALL DEFENDANTS]

226. Plaintiff incorporates all paragraphs *supra* into this Count.

227. Plaintiff has a Fourth Amendment right to be free of unreasonable seizures. U.S. CONST., AMD. IV ("The right of the people to be secure in their persons, … papers, and effects against unreasonable searches and seizures, shall not be violated").

228. Defendants Keller and Darnell evicted Miller from the Dallas Art Fair on April 12, 2015, escorting Miller from the premises under threat of arrest, and on their own initiative—even after verifying that they had no probable cause to do so. By seizing Miller without probable cause, Officers Keller and Darnell are liable

under § 1983 because they intentionally committed acts, acting under color of law, they violated Miller's Fourth and Fourteenth Amendment rights. Defendants Dunn, Leyendecker, and Taylor instigated the actions of these police officers by making a false complaint to a peace officer; thus they also participated in this violation.

229. No reasonable officer could have believed that any action of Plaintiff Miller at the 2015 Dallas Art Fair comprised an offense punishable within the bounds of the Constitution. Any reasonable officer would have known that, under clearly established law, there was no probable cause to evict Miller from a public venue under threat of arrest.

230. Defendant Plumlee issued a capias warrant against Miller on January 25, 2018 without prior notice of hearing—or indeed any prior notice to Miller of the existence of the child support enforcement proceedings. As a result, Miller was arrested and jailed on February 15, 2018. That violation of Miller's Fourth Amendment rights stands out as particularly egregious, even among the throng of Plumlee's violations of Miller's rights since 2013.

231. Defendant Plumlee also ordered the detention and handcuffing of Plaintiff Miller after his child support enforcement trial on October 22, 2018. In finding Miller guilty of contempt for nonpayment, Plumlee ignored compelling evidence that Miller was indigent—and she indeed fraudulently assisted in the

manufacturing of false evidence.

232.     The County is liable under § 1983 for the violation of Plaintiff Miller's rights because the need for more or different judicial training here is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the County can reasonably be said to have been deliberately indifferent to the need. The County's inadequate training and supervision caused, or contributed to causing, Defendants Diaz and Plumlee to intentionally commit acts, acting under color of law, that violated Miller's Fourth Amendment rights. *Connick v. Thompson*, 563 U.S. 51, 63-64 (2011); *City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989). Repeated violations of individuals' civil rights is the predictable consequence of the County's failure to train judges regarding the Constitutional limitations on search and seizure.

233.     The City of Dallas is liable under § 1983 for the violation of Plaintiff Miller's rights because the need for more or different police training here is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the City can reasonably be said to have been deliberately indifferent to the need.   Officer Keller's and Officer Darnell's conduct is the product of the City's failure to train officers or remedy problems in the face of repeated incidents where the City's officers, agents or both, acting under color of law, intentionally deprived citizens of constitutional rights.   (The refusal of the Dallas Police

Department to discipline its officers for their actions after a thorough Internal Affairs investigation only serves to emphasize the City's deficiency.) This inaction on the City's part constitutes deliberate indifference to civil rights and rises to the level of a custom or policy.

234.   As a direct and proximate result of all the actions of the Defendants named under this count, and the City's and County's wrongful conduct, Plaintiff Miller suffered unlawful arrest, detention, anguish, embarrassment, humiliation, stress, and anxiety, and will continue to suffer damages.

## COUNT III – EIGHTH AMENDMENT VIOLATIONS
## [DEFENDANTS: DUNN, FINDLEY, ROCHELLE, PLUMLEE, DIAZ, MIHALOPOULOS, THE HOCKADAY SCHOOL, DALLAS COUNTY, AND THE CITY OF DALLAS]

235.   Plaintiff incorporates all paragraphs *supra* into this Count.

236.   Plaintiff has an Eighth Amendment right to be free from excessive fines. U.S. CONST., AMD. VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted").

237.   On February 15, 2018, Miller was arrested by DPD Officers on a fraudulently-issued warrant issued by Defendant Plumlee, and subsequently incarcerated.

238.   On October 22, 2018, at Miller's enforcement trial, Defendant Plumlee

imposed community supervision (i.e. probation) for 10 years at a cost of $25 per month, and levied a $500 fine for court costs against Miller. Plumlee's levying of court fines and attorney's fees against Miller—an indigent party—clearly violated his Eighth and Fourteenth Amendment rights. *See Timbs v. Indiana*, 586 U.S. \_\_\_ (2019); *Campbell v. Wilder*, 487 S.W.3d 146 at 151-152 (Tex. 2016); *Equitable Gen. Ins. Co. v. Yates*, 684 S.W.2d 669 at 671 (Tex. 1984); *Bearden v. Georgia*, 461 U.S. 660 at 671 (1983).

239.    In her trial ruling in Dunn's 2015 modification suit, Plumlee levied $25,000 in attorney's fees and $517.33 in court costs against Miller, as well as imposing a $15,000 appellate bond requirement—despite the fact that Dunn's suit was filed without grounds, as is required by the Texas Family Code. Plumlee also violated Miller's Eighth and Fourteenth Amendment rights in that ruling, and again in her subsequent November 17, 2016 final order.

240.    Certainly, the rulings and orders Plumlee and Diaz have imposed on Miller, and their constant abuse of Miller by these rulings and orders since 2013 (especially keeping his daughter from him for two years), qualify as "cruel and unusual punishment," which is also forbidden by the Eight Amendment.

241.    Defendants Dunn, Rochelle, Findley, and Mihalopoulos (and by extension, the Hockaday School) have conspired in these Eighth Amendment violations by instigating, filing, and prosecuting the fraudulent cases that resulted

in these violations of Miller's rights. Dunn, Rochelle, and Findley specifically requested the $25,000 attorneys' fees levy that Plumlee imposed in Dunn's 2015 modification suit.

242.    The County is liable under § 1983 for the violation of Plaintiff Miller's rights because the need for more or different judicial training here is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the County can reasonably be said to have been deliberately indifferent to the need. The County's inadequate training and supervision caused, or contributed to causing, Defendants Diaz and Plumlee to intentionally commit acts, acting under color of law, that violated Miller's Eighth Amendment rights. *Connick v. Thompson*, 563 U.S. 51, 63-64 (2011); *City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989). Repeated violations of individuals' civil rights is the predictable consequence of the County's failure to train judges regarding the Constitutional limitations on imposing fees and fines on indigent parties, and on imposing fees and fines in frivolous cases that are filed without grounds.

243.    The City of Dallas is liable under § 1983 for the violation of Plaintiff Miller's rights because the need for more or different police training here is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the City can reasonably be said to have been deliberately indifferent to the need. The conduct of the DPD officers involved is the product of the City's

failure to train officers or remedy problems in the face of repeated incidents where the City's officers, agents or both, acting under color of law, intentionally deprived citizens of constitutional rights.    This inaction on the City's part constitutes deliberate indifference to civil rights and rises to the level of a custom or policy.

244.    As a direct and proximate result of all Defendants' actions, and the City's and County's wrongful conduct, Plaintiff Miller suffered unlawful treatment, anguish, embarrassment, humiliation, stress, and anxiety, and will continue to suffer damages.

## COUNT IV – FOURTEENTH AMENDMENT VIOLATIONS WITH REGARD TO FUNDAMENTAL PARENTAL RIGHTS [DEFENDANTS: DUNN, FINDLEY, ROCHELLE, PLUMLEE, DIAZ, MIHALOPOULOS, THE HOCKADAY SCHOOL, DALLAS COUNTY, AND THE CITY OF DALLAS]

245.    Plaintiff incorporates all paragraphs *supra* into this Count.

246.    Plaintiff has a Fourteenth Amendment right to maintain the parent-child relationship, to familial association, and to parent his child without government interference.    *See May v. Anderson*, 345 U.S. 528, 533 (1953); *Lassiter v. Department of Social Services*, 452 U.S. 18, 27 (1981); *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Troxel v. Granville*, 530 U.S. 57, 65-66 (2000); *Meyer v. Nebraska*, 262 U.S. 390, 399

(1923); *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 926-927 (1992); *Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *Hollingsworth v. Hill*, 110 F.3d 733, 739 (10th Cir. 1997).

247.    The suits fraudulently instigated, filed, and prosecuted by Defendants Dunn, Rochelle, Findley, Mihalopoulos, along with the fraudulent rulings and orders issued by Defendants Plumlee and Diaz without jurisdiction, have caused the erosion of Miller's parent-child relationship and the restriction of his parental rights.

248.    The modification trial ruling and fraudulent post-trial order issued by Plumlee on November 17, 2016 made Dunn the Sole Managing Conservator and removed Miller from the role of Managing Conservator of their child, in violation of Miller's Fourteenth Amendment right to parent, and also his right to Equal Treatment. Plumlee's order also stripped him of the power to make educational and medical decisions for his daughter, further violating his Fourteenth Amendment rights.

249.    Defendant Diaz's fraudulent temporary orders, signed without jurisdiction on June 7, 2018, are the most egregious example of Defendants' violation of Miller's parental rights. **These orders have kept Miller from seeing his daughter for almost two years.**

250.    The Hockaday School has assisted in this effort by observing and

enforcing Defendant Diaz's temporary orders as is they were legitimate—though Hockaday has repeatedly been informed that they are not. While Chair of the Board of Trustees of the Hockaday School, Defendant Mihalopoulos personally instigated Dunn's fraudulent 2015 modification suit against Miller that resulted in the infringement of his parental rights.

251.    The Dallas Police Department has violated Miller's parental rights by repeatedly refusing to enforce Texas Penal Code § 25.03, thereby knowingly depriving Miller of court-ordered time with his daughter.

252.    The County is liable under § 1983 for the violation of Plaintiff Miller's rights because the need for more or different judicial training here is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the County can reasonably be said to have been deliberately indifferent to the need. The County's inadequate training and supervision caused, or contributed to causing, Defendants Diaz and Plumlee to intentionally commit acts, acting under color of law, that violated Miller's Fourteenth Amendment rights. *Connick v. Thompson*, 563 U.S. 51, 63-64 (2011); *City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989). Repeated violations of individuals' civil rights is the predictable consequence of the County's failure to train judges regarding the Constitutional limitations on interfering with parental rights.

253.    The City of Dallas is liable under § 1983 for the violation of Plaintiff

Miller's rights because the need for more or different police training here is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the City can reasonably be said to have been deliberately indifferent to the need. The refusal of DPD officers to enforce TPC § 25.03 is the product of the City's failure to train officers or remedy problems in the face of repeated incidents where the City's officers, agents or both, acting under color of law, intentionally deprived citizens of constitutional rights.     This inaction on the City's part constitutes deliberate indifference to civil rights and rises to the level of a custom or policy.

254.     As a direct and proximate result of the action of the Defendants named in this Count, and the City's and County's wrongful conduct, Plaintiff Miller suffered unlawful treatment, anguish, embarrassment, humiliation, stress, and anxiety, and will continue to suffer damages.

# COUNT V – FOURTEENTH AMENDMENT VIOLATIONS WITH
## REGARD TO DUE PROCESS
### [ALL DEFENDANTS]

255.     Plaintiff incorporates all paragraphs *supra* into this Count.

256.     Plaintiff has a Fourteenth Amendment right to Due Process.

257.     The Defendants have violated Miller's Due Process rights so many times, and in so many ways, that it is difficult to enumerate them.

258.    The gag orders requested by Dunn, Findley, and Rochelle (and at the instigation of Mihalopoulos), and issued by Defendants Diaz and Plumlee—and then upheld after several appeals by Miller—have violated Miller's Due Process rights not only in their issuance, but also in preventing him from protecting his interests in court.

259.    The hearings held and orders issued without jurisdiction by Defendants Plumlee and Diaz represent the most serious violations of Miller's Due Process rights.    Plumlee and Diaz were pretending to be judges while acting as individuals—and indeed as criminals—while producing orders they claimed to be legitimate instruments of a court, but were in fact fraudulent documents.    The participation of Defendants Rochelle and Findley in these acts on behalf of Dunn—especially in the presenting and signing of orders on November 17, 2016 and June 7, 2018—further violated Miller's Due process rights, as well as TPC § 32.46, and 18 U.S.C. §§ 241 and 242.

260.    Plumlee's spurious quashing of Miller's subpoenas at the de novo hearing on July 23, 2015 kept him from presenting vital and relevant evidence to the court, thus violating Miller's right to Due Process.

261.    Defendant Plumlee's issuance of a capias warrant without notifying Miller of court proceedings against him represents an equally serious violation of Miller's rights. (Plumlee's actions also violated his Sixth Amendment right "to be

informed of the nature and cause of the accusation.") That act was compounded by Miller's arrest and incarceration by the Dallas Police Department and officers of Dallas County.

262. The eviction of Miller from the Dallas Art Fair by Dallas Police without probable cause also violated Miller's right to Due Process because the officers did not act according to the law, and they subjected Miller to a legal consequence without the application of the law. As mentioned, Defendants Dunn, Leyendecker, and Taylor also participated in that act; and Sughrue participated as an accessory after the fact, in violation of 18 U.S.C. § 3.

263. The repeated refusals of the Dallas Police Department to enforce Texas Penal Code § 25.03 have violated Due Process Miller's rights because they have deprived him of remedy under the law.

264. The refusal of Defendant Diaz to allow Miller to attend his daughter's birthday party—though it was a stipulation of Miller's Divorce Decree—violated Miller's Fourteenth Amendment right to contract.

265. The submission of Diaz's fraudulent June 7, 2018 temporary orders to Hockaday by Defendants Dunn, Rochelle, and Findley violated Miller's Due Process rights, as well as TPC §§ 32.48 and 37.13.

266. The Hockaday School has violated Miller's Due Process rights by observing a fraudulent so-called "court order" as if it were legitimate, while

knowing that it is not. And two Hockaday Board Chairs—Defendants Dunn and Mihalopoulos—have participated in fraudulent court proceedings against Miller while sitting on Hockaday's Board, and while acting on Hockaday's behalf (i.e. to silence Miller's criticism of Hockaday, and thereby to enrich the school through Dunn's contributions and assistance with fundraising efforts).

267.    Dunn's burglary of Miller's residence on or around November 17, 2013 and the photographing of Miller's legal documents and evidence to be used in his divorce case violated Miller's Due Process rights, as well as TPC § 30.02.

268.    Miller asserts that Defendant Plumlee's and Defendant Diaz's multiple violations of his constitutional rights after he began representing himself in 2015—and certainly after he filed his Texas Supreme Court mandamus petition in 2016 (case # 16-0487), and subsequently complained about their conduct to law enforcement—represent acts of retaliation, in violation of TPC § 36.06.

269.    The County is liable under § 1983 for the violation of Plaintiff Miller's rights because the need for more or different judicial training here is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the County can reasonably be said to have been deliberately indifferent to the need. The County's inadequate training and supervision caused, or contributed to causing, Defendants Diaz and Plumlee to intentionally commit acts, acting under color of law, that violated Miller's Fourteenth Amendment Due Process rights.

VERIFIED COMPLAINT                100

*Connick v. Thompson*, 563 U.S. 51, 63-64 (2011); *City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989). Repeated violations of individuals' civil rights is the predictable consequence of the County's failure to train judges regarding the Constitutional responsibilities to ensure Due Process.

270. The City of Dallas is liable under § 1983 for the violation of Plaintiff Miller's rights because the need for more or different police training here is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the City can reasonably be said to have been deliberately indifferent to the need. The refusal of DPD officers to enforce TPC § 25.03 is the product of the City's failure to train officers or remedy problems in the face of repeated incidents where the City's officers, agents or both, acting under color of law, intentionally deprived citizens of constitutional rights. This inaction on the City's part constitutes deliberate indifference to civil rights and rises to the level of a custom or policy.

271. As a direct and proximate result of the action of the Defendants named in this Count, and the City's and County's wrongful conduct, Plaintiff Miller suffered unlawful treatment, anguish, embarrassment, humiliation, stress, and anxiety, and will continue to suffer damages.

## COUNT VI – FRAUD

## [DEFENDANTS: DUNN, FINDLEY, ROCHELLE, PLUMLEE, DIAZ, MIHALOPOULOS, THE HOCKADAY SCHOOL, DALLAS COUNTY]

272.   Plaintiff incorporates all paragraphs *supra* into this Count.

273.   The acts of the Defendants named in this count have illegally deprived Miller of a substantial amount of money.

274.   In Miller's 2013-2014 divorce case, Dunn repeatedly committed perjury and aggravated perjury with the assistance and at the subornation of Rochelle and Findley; and Dunn, Rochelle, Findley repeatedly requested gag orders that were granted by Defendants Plumlee and Diaz. The unnecessary litigation generated by the illegal actions of these Defendants cost Miller $270,000 in attorneys' fees and related expenses. The Defendants also thus denied Miller the opportunity to fully litigate at trial all the rights or defenses that could have been asserted, which resulted in the inequitable division of his marital assets; the exact amount in question remains unknown.

275.   Dunn's 2015 civil suit against Miller, which requested and gained an unconstitutional gag order against Miller, cost Miller an additional $50,000 in attorneys' fees.

276.   Dunn's 2015 custody modification suit against Miller, which was filed without grounds, cost Miller an additional $5,000 in attorneys' fees, in addition to

wages lost due to time spent representing himself after the first hearing, and in related appeals.

277. Defendant Plumlee issued an order without jurisdiction on November 17, 2016 that levied \$25,000 in attorney's fees and \$517.33 in court costs against Miller, as well as imposing a \$15,000 appellate bond requirement. Plumlee had no standing to rule or hold proceedings in Miller's case at the time, and her act was thus done in her individual capacity. This act thus violated Texas Penal Code § 32.46, as well as 18 U.S.C. §§ 241 and 242. Because Dunn's attorney, Defendant Rochelle, presented the order to a judge while knowing that the court had no jurisdiction, and the financial harm to Miller exceeded \$30,000, Rochelle's act constitutes a third-degree felony. TPC § 32.46(b)(5). Unfortunately, Defendant Plumlee's trial order is still in effect. Defendants Dunn, Rochelle, and Findley participated in this act; and Mihalopoulos conspired in the act by instigating the groundless modification suit that resulted in the financial fraud.

278. Defendant Diaz issued an order without jurisdiction on June 7, 2018 requiring Miller to pay a fee to a supervised visitation center (\$60 registration, \$60 per hour for visitation) if he wishes to see his daughter. This act likewise violated Texas Penal Code § 32.46, as well as 18 U.S.C. §§ 241 and 242. And because Defendant Findley presented the order to Diaz while knowing that the court had no jurisdiction, Findley's act violated TPC § 32.46(b)(5). Defendants Dunn and

Rochelle also participated in this act.

279. The Hockaday School participated in this fraud in that two Hockaday Board Chairs—Defendants Dunn and Mihalopoulos—have participated in these fraudulent court proceedings against Miller while sitting on Hockaday's Board, and while acting on Hockaday's behalf (i.e. to silence Miller's criticism of Hockaday, and thereby to enrich the school through Dunn's contributions and assistance with fundraising efforts). Mihalopoulos personally instigated Dunn's groundless 2015 modification suit against Miller, which illicitly deprived Miller of $5,000 in attorney's fees, as well as of a year and of half of lost time and wages—plus an additional three years of time and wages lost due to the resulting appeals.

280. The County is liable under § 1983 for the violation of Plaintiff Miller's rights because the need for more or different judicial training here is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the County can reasonably be said to have been deliberately indifferent to the need. The County's inadequate training and supervision caused, or contributed to causing, Defendants Diaz and Plumlee to intentionally commit acts, acting under color of law, that resulted in the instances of fraud committed against Miller. *Connick v. Thompson*, 563 U.S. 51, 63-64 (2011); *City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989). Repeated violations of individuals' civil rights is the predictable consequence of the County's failure to train judges regarding the

Constitutional responsibilities to prevent fraud.

281.    As a direct and proximate result of the action of the Defendants named in this Count, and the County's wrongful conduct, Plaintiff Miller suffered unlawful treatment, anguish, embarrassment, humiliation, stress, and anxiety, and will continue to suffer damages.

## COUNT VII – CONSPIRACY AGAINST RIGHTS
## AND CONSPIRACY TO DEFRAUD
### [ALL DEFENDANTS]

282.    Plaintiff incorporates all paragraphs *supra* into this Count.

283.    18 U.S.C. § 241 outlaws the collaboration of multiple persons in any effort "to oppress, threaten, or intimidate any person…in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States."

284.    18 U.S.C. § 242 outlaws any such deprivations conducted under color of law.

285.    18 U.S.C. § 1349 makes it a crime to conspire in fraud; TPC § 15.02 likewise outlaws criminal conspiracy generally.

286.    Defendants Dunn, Rochelle, Findley and Plumlee have worked together since the inception of Miller's divorce case in 2013 to deprive him of his rights and property. Defendant Diaz joined the effort when she became involved in the case

in 2015.

287.    Dunn, Rochelle, and Findley have requested illegal orders, committed and suborned perjury, knowingly submitted orders to a court without jurisdiction, and filed and prosecuted several groundless suits against Miller in a collaborative effort to deprive Miller of his rights to free speech and to parent his own child, and also to deprive Miller of his money.  Defendants Plumlee and Diaz have allowed these abusive suits to proceed unhindered, and twice have signed orders without jurisdiction that were presented by Rochelle and Findley on behalf of Dunn.

288.    Rochelle—while fully aware that the 330th Family District Court had no jurisdiction—submitted an order to Plumlee on Dunn's behalf on November 17, 2016, and Plumlee signed it.  The act violated TPC § 15.02, TPC § 32.46, 18 U.S.C. § 1349, 18 U.S.C. §§ 241 and 242, and 18 U.S.C. § 4.  Because Plumlee's fraudulent order also imposed financial levies and therefore inflicted financial harm, the act also violated 18 U.S. Code § 1341.

289.    Defendant Mihalopolous personally instructed Dunn and her attorneys to request an illegal gag order to prevent him from speaking to Hockaday (or to anyone) about the actions of Dunn and Mihalopolous; Dunn then filed a groundless suit in the 330th Family District Court in 2015, requesting a gag order, and Defendants Diaz and Plumlee granted it, along with other unconstitutional infringements of Miller's rights.  (Dunn also requested a gag order against Miller

in the 191st Civil District Court immediately after Mihalopoulos instructed Dunn to seek one.)  The act violated TPC § 15.02, 18 U.S.C. § 1349, 18 U.S.C. §§ 241 and 242, and 18 U.S.C. § 4.  Because Mihalopoulos' act eventually resulted in Plumlee's fraudulent order that imposed financial levies against Miller, Mihalopoulos' act also violated 18 U.S. Code § 1341.

290.    Findley—while fully aware that the 330th Family District Court had no jurisdiction—submitted an order to Diaz on Dunn's behalf on June 7, 2018, and Diaz signed it.  The act violated TPC § 15.02, TPC § 32.46, 18 U.S.C. § 1349, and 18 U.S.C. §§ 241, 242, and 4. Because Diaz's fraudulent order also imposed financial levies, the act also violated 18 U.S. Code § 1341.

291.    Findley, Rochelle, and Dunn then presented Diaz's fraudulent order to the Hockaday School; and Hockaday enforced (and is still enforcing) Diaz's fraudulent order—despite being aware that it was and is not legitimate—keeping Miller away from the school and from his daughter. These acts violated TPC § 15.02, TPC § 32.48, 18 U.S.C. § 1349, and 18 U.S.C. §§ 241, 242, 3, and 4.

292.    Dunn, Leyendecker, and Taylor made a false report to DPD Officers Keller and Darnell at the Dallas Art Fair on April 11, 2015; and Defendants Keller and Darnell then illegally evicted Miller, violating his First and Fourteenth Amendment rights. Defendant Sughrue then provided Dunn with assistance in this crime after the fact.  These acts violated TPC § 15.02, TPC § 37.08, 18 U.S.C. §

1349, and 18 U.S.C. §§ 241, 242, 3, and 4.

293.   Plumlee held child support enforcement proceedings against Miller without notifying him; and Rochelle and Findley participated in these proceedings on behalf of Dunn without notifying Miller of their existence. Plumlee then issued a fraudulent capias warrant against Miller, which resulted in his arrest by Dallas Police on February 15, 2018, and his incarceration in a jail operated by Dallas County. These acts violated TPC § 15.02, TPC § 36.06, 18 U.S.C. § 1349, and 18 U.S.C. §§ 241, 242, and 4. Because Plumlee imposed financial levies at trial in the enforcement proceeding, the combined act also violated 18 U.S. Code §§ 1341 and 1349.

294.   Miller asserts that Defendant Plumlee's and Defendant Diaz's multiple violations of his constitutional rights after he began representing himself in 2015— and certainly after he filed his Texas Supreme Court mandamus petition in 2016 (case # 16-0487)—represent acts of retaliation, in violation of TPC § 36.06.

295.   The Defendants have acted at different times and in different ways, but the common theme is that they have all acted in concert to commit crimes against Miller that resulted in egregious violations of his constitutional rights, as well as in extreme and persistent financial deprivations.

296.   The County is liable under § 1983 for the violation of Plaintiff Miller's rights because the need for more or different judicial training here is so obvious,

and the inadequacy so likely to result in the violation of constitutional rights, that the County can reasonably be said to have been deliberately indifferent to the need. The County's inadequate training and supervision caused, or contributed to causing, Defendants Diaz and Plumlee to intentionally commit acts, acting under color of law, that resulted in the conspiracy committed against Miller. *Connick v. Thompson*, 563 U.S. 51, 63-64 (2011); *City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989). Repeated violations of individuals' civil rights is the predictable consequence of the County's failure to train judges regarding their basic responsibility not to engage in criminal acts, or in criminal conspiracy.

297.   The City of Dallas is liable under § 1983 for the violation of Plaintiff Miller's rights because the need for more or different police training here is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the City can reasonably be said to have been deliberately indifferent to the need. The conspiratorial acts of the DPD officers involved is the product of the City's failure to train officers or remedy problems in the face of repeated incidents where the City's officers, agents or both, acting under color of law, intentionally deprived citizens of constitutional rights.   This inaction on the City's part constitutes deliberate indifference to civil rights and rises to the level of a custom or policy.

298.   As a direct and proximate result of the action of the Defendants named

VERIFIED COMPLAINT          109

in this Count, and the County's wrongful conduct, Plaintiff Miller suffered unlawful arrest, anguish, embarrassment, humiliation, stress, and anxiety, and will continue to suffer damages.

## COUNT VIII – NEGLECT IN PREVENTING INJURIES

## TO RIGHTS AND INTERESTS

## [DEFENDANTS: ROCHELLE, FINDLEY, PLUMLEE, MIHALOPOULOS, DALLAS COUNTY, AND THE CITY OF DALLAS]

299. Plaintiff incorporates all paragraphs *supra* into this Count.

300. As a direct and proximate result of the individual Defendants' above-described actions in routinely aiding and abetting each others' fraud upon the court, general fraud, and constructive fraud, routinely resulting in the numerous deprivations and violations of Plaintiff Miller's rights and interests described within all other Counts contained herein, by derelictions of their legal duties under professional conduct rules (ethics rules) and federal statute (18 U.S.C. § 4) to promptly report each other to the appropriate authorities, and thereby also necessarily and affirmatively neglecting to prevent all of the same injuries caused and inflicted on Plaintiff Miller by the other individual Defendants herein; and by the two governmental entity Defendants' failing to otherwise accordingly act upon their established duties as fully described *supra*; Plaintiff Miller has suffered all of those same numerous deprivations and violations of their rights and interests

described in all other Counts contained herein, with all and the same issues fully actionable through 42 USC § 1986.

301.    Plaintiff Miller will continue to suffer damages as a result of this neglect.

## COUNT VIII – INTENTIONAL INFLICTION

## OF EMOTIONAL DISTRESS

## [ALL DEFENDANTS]

302.    Plaintiff incorporates all paragraphs *supra* into this Count.

303.    By their conspiratorial, illegal, and abusive acts, the Defendants named in this count have caused Plaintiff Miller to be deprived of his constitutional rights, his home, his child, his assets, his time, his energy, and even his freedom—while fully knowing that their actions would have these effects.

304.    Especially, the sheer depravity involved in taking a child from a parent, and a parent from a child, boggles the imagination. Defendants Dunn, Rochelle, Findley, Plumlee, Mihalopoulos, and the Hockaday School have knowingly and intentionally conspired to do just that. The Defendant's actions do not reflect the proper course of legitimate legal process; rather, they are the manifestations of the twisted minds of criminal psychopaths. The perversity and sadism involved in such an endeavor is beyond comprehension.

305.    It is also disappointing—and unacceptable—that Dallas Police officers should knowingly violate Miller's right to freedom of assembly, and then subject

him to humiliation by improperly evicting him from a public venue, and Defendants Darnell and Keller did.

306.    The County is liable under § 1983 for the violation of Plaintiff Miller's rights because the need for more or different judicial training here is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the County can reasonably be said to have been deliberately indifferent to the need. The County's inadequate training and supervision caused, or contributed to causing, Defendants Diaz and Plumlee to intentionally commit acts, acting under color of law, that resulted in the intentional harm caused to Miller. *Connick v. Thompson*, 563 U.S. 51, 63-64 (2011); *City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989). Repeated violations of individuals' civil rights is the predictable consequence of the County's failure to train judges regarding their basic responsibility not to engage in such harmful and tortious acts.

307.    The City of Dallas is liable under § 1983 for the violation of Plaintiff Miller's rights because the need for more or different police training here is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the City can reasonably be said to have been deliberately indifferent to the need. The acts of the DPD officers involved is the product of the City's failure to train officers or remedy problems in the face of repeated incidents where the City's officers, agents or both, acting under color of law, intentionally deprived

citizens of constitutional rights. This inaction on the City's part constitutes deliberate indifference to civil rights and rises to the level of a custom or policy.

308. As a direct and proximate result of the action of the Defendants named in this Count, and the City's and County's wrongful conduct, Plaintiff Miller suffered unlawful treatment, anguish, embarrassment, humiliation, stress, and anxiety, and will continue to suffer damages.

## COUNT IX – MALICIOUS PROSECUTION

## [DEFENDANTS: DUNN, ROCHELLE, FINDLEY, PLUMLEE, MIHALOPOULOS, DALLAS COUNTY]

309. Plaintiff incorporates all paragraphs *supra* into this Count.

310. Defendants Dunn, Rochelle, Findley, and Mihalopoulos 1) instigated Dunn's 2015 modification suit against Miller 2) without probable cause or grounds, 3) with malice; and 4) the suit terminated in Dunn's favor, and 5) Miller suffered damages as a result. Plumlee and Diaz knowingly assisted Dunn and her attorneys in this fraudulent suit.

311. Dunn's 2013 divorce suit, which was founded on false allegations and perjury, was similarly pursued and terminated.

312. Miller's child support enforcement prosecution—which resulted in Miller's pretrial arrest and incarceration—was similarly pursued and terminated.

313. The United States Supreme Court has established that unlawful pretrial

detention is cognizable under the Fourth Amendment. *Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 914-15 (2017). The United States First Circuit Court of Appeals further ruled that a "Fourth Amendment malicious prosecution claim" for unlawful pretrial detention is cognizable under § 1983. *Hernandez-Cuevas v. Taylor*, 723 F.3d 91 (1st Cir. 2013).

314. The County is liable under § 1983 for the violation of Plaintiff Miller's rights because the need for more or different judicial training here is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the County can reasonably be said to have been deliberately indifferent to the need. The County's inadequate training and supervision caused, or contributed to causing, Defendants Diaz and Plumlee to commit acts, acting under color of law, that resulted in the malicious prosecution of Plaintiff Miller. *Connick v. Thompson*, 563 U.S. 51, 63-64 (2011); *City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989). Repeated violations of individuals' civil rights is the predictable consequence of the County's failure to train judges regarding their basic responsibility not to engage in such acts.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment upon all Counts inclusive, as follows:

Against Defendant VIRGINIA TALLEY DUNN:

1) Replevin of all said losses wrongfully incurred and/or otherwise deprived;

2) Compensatory damages in the amount of $10,000,000 USD, including for pain and suffering;

3) Punitive and/or special damages according to proof;

4) Appropriate injunctive and declaratory relief pursuant to F.R.Cv.P. Rules 57 and 65 and/or the same relief pursuant to and under 28 USC §§ 2201 and 2202, not the least of which includes declaring Defendant's actions null and void for lack of due process, and that Defendant's actions constitute fraud and/or constructive fraud for treble damages;

5) An Order that Defendant pay all costs and expenses of suit incurred herein; and,

6) All such other and further relief as the Jury and/or Court deems just and proper.

Against Defendant ANDREA PLUMLEE:

1) Replevin of all said losses wrongfully incurred and/or otherwise deprived;

2) Compensatory damages in the amount of $10,000,000 USD, including for pain and suffering;

VERIFIED COMPLAINT          115

3) Punitive and/or special damages according to proof;

4) Appropriate injunctive and declaratory relief pursuant to F.R.Cv.P. Rules 57 and 65 and/or the same relief pursuant to and under 28 USC §§ 2201 and 2202, not the least of which includes declaring Defendant's actions null and void for lack of due process, and that Defendant's actions constitute fraud and/or constructive fraud for treble damages;

5) Injunctive relief prohibiting Defendant from issuing future rulings or orders that limit Plaintiff's freedom of speech and assembly and/or parental rights.

6) An Order that Defendant pay all costs and expenses of suit incurred herein; and,

7) All such other and further relief as the Jury and/or Court deems just and proper.

Against Defendant DANIELLE DIAZ:

1) Replevin of all said losses wrongfully incurred and/or otherwise deprived;

2) Compensatory damages in the amount of $10,000,000 USD, including for pain and suffering;

3) Punitive and/or special damages according to proof;

4) Appropriate injunctive and declaratory relief pursuant to F.R.Cv.P. Rules 57 and 65 and/or the same relief pursuant to and under 28 USC §§ 2201 and 2202, not the least of which includes declaring Defendant's actions

null and void for lack of due process, and that Defendant's actions constitute fraud and/or constructive fraud for treble damages;

5) Injunctive relief prohibiting Defendant from issuing future rulings or orders that limit Plaintiff's freedom of speech and assembly and/or parental rights.

6) An Order that Defendant pay all costs and expenses of suit incurred herein; and,

7) All such other and further relief as the Jury and/or Court deems just and proper.

Against Defendant PATRICIA LINEHAN ROCHELLE:

1) Replevin of all said losses wrongfully incurred and/or otherwise deprived;

2) Compensatory damages in the amount of $10,000,000 USD, including for pain and suffering;

3) Punitive and/or special damages according to proof;

4) Appropriate injunctive and declaratory relief pursuant to F.R.Cv.P. Rules 57 and 65 and/or the same relief pursuant to and under 28 USC §§ 2201 and 2202, not the least of which includes declaring Defendant's actions null and void for lack of due process, and that Defendant's actions constitute fraud and/or constructive fraud for treble damages;

5) An Order that Defendant pay all costs and expenses of suit incurred herein; and,

6) All such other and further relief as the Jury and/or Court deems just and proper.

Against Defendant DAVID H. FINDLEY:

1) Replevin of all said losses wrongfully incurred and/or otherwise deprived;

2) Compensatory damages in the amount of $10,000,000 USD, including for pain and suffering;

3) Punitive and/or special damages according to proof;

4) Appropriate injunctive and declaratory relief pursuant to F.R.Cv.P. Rules 57 and 65 and/or the same relief pursuant to and under 28 USC §§ 2201 and 2202, not the least of which includes declaring Defendant's actions null and void for lack of due process, and that Defendant's actions constitute fraud and/or constructive fraud for treble damages;

5) An Order that Defendant pay all costs and expenses of suit incurred herein; and,

6) All such other and further relief as the Jury and/or Court deems just and proper.

Against Defendant MARYANN MIHALOPOULOS:

1) Replevin of all said losses wrongfully incurred and/or otherwise deprived;

2) Compensatory damages in the amount of $10,000,000 USD, including for

pain and suffering;

3) Punitive and/or special damages according to proof;

4) Appropriate injunctive and declaratory relief pursuant to F.R.Cv.P. Rules 57 and 65 and/or the same relief pursuant to and under 28 USC §§ 2201 and 2202, not the least of which includes declaring Defendant's actions null and void for lack of due process, and that Defendant's actions constitute fraud and/or constructive fraud for treble damages;

5) An Order that Defendant pay all costs and expenses of suit incurred herein; and,

6) All such other and further relief as the Jury and/or Court deems just and proper.

Against Defendant THE HOCKADAY SCHOOL:

1) Replevin of all said losses wrongfully incurred and/or otherwise deprived;

2) Compensatory damages in the amount of $30,000,000 USD, including for pain and suffering;

3) Punitive and/or special damages in the amount of $100,000,000, according to proof;

4) Appropriate injunctive and declaratory relief pursuant to F.R.Cv.P. Rules 57 and 65 and/or the same relief pursuant to and under 28 USC §§ 2201 and 2202, not the least of which includes declaring Defendant's actions

null and void for lack of due process, and that Defendant's actions
constitute fraud and/or constructive fraud for treble damages;

5) An Order that Defendant pay all costs and expenses of suit incurred herein;
and,

6) All such other and further relief as the Jury and/or Court deems just and
proper.

Against Defendant MEREDITH LEYENDECKER:

1) Replevin of all said losses wrongfully incurred and/or otherwise deprived;

2) Compensatory damages in the amount of $1,000,000 USD, including for
pain and suffering;

3) Punitive and/or special damages according to proof;

4) Appropriate injunctive and declaratory relief pursuant to F.R.Cv.P. Rules
57 and 65 and/or the same relief pursuant to and under 28 USC §§ 2201
and 2202, not the least of which includes declaring Defendant's actions
null and void for lack of due process, and that Defendant's actions
constitute fraud and/or constructive fraud for treble damages;

5) An Order that Defendant pay all costs and expenses of suit incurred herein;
and,

6) All such other and further relief as the Jury and/or Court deems just and
proper.

Against Defendant BETH TAYLOR:

1) Replevin of all said losses wrongfully incurred and/or otherwise deprived;

2) Compensatory damages in the amount of $1,000,000 USD, including for pain and suffering;

3) Punitive and/or special damages according to proof;

4) Appropriate injunctive and declaratory relief pursuant to F.R.Cv.P. Rules 57 and 65 and/or the same relief pursuant to and under 28 USC §§ 2201 and 2202, not the least of which includes declaring Defendant's actions null and void for lack of due process, and that Defendant's actions constitute fraud and/or constructive fraud for treble damages;

5) An Order that Defendant pay all costs and expenses of suit incurred herein; and,

6) All such other and further relief as the Jury and/or Court deems just and proper.

Against Defendant JOHN SUGHRUE:

1) Replevin of all said losses wrongfully incurred and/or otherwise deprived;

2) Compensatory damages in the amount of $1,000,000 USD, including for pain and suffering;

3) Punitive and/or special damages according to proof;

4) Appropriate injunctive and declaratory relief pursuant to F.R.Cv.P. Rules

57 and 65 and/or the same relief pursuant to and under 28 USC §§ 2201 and 2202, not the least of which includes declaring Defendant's actions null and void for lack of due process, and that Defendant's actions constitute fraud and/or constructive fraud for treble damages;

5) An Order that Defendant pay all costs and expenses of suit incurred herein; and,

6) All such other and further relief as the Jury and/or Court deems just and proper.

Against Defendant LACIE DARNELL:

1) Replevin of all said losses wrongfully incurred and/or otherwise deprived;

2) Compensatory damages in the amount of $100,000 USD, including for pain and suffering;

3) Punitive and/or special damages according to proof;

4) Appropriate injunctive and declaratory relief pursuant to F.R.Cv.P. Rules 57 and 65 and/or the same relief pursuant to and under 28 USC §§ 2201 and 2202, not the least of which includes declaring Defendant's actions null and void for lack of due process, and that Defendant's actions constitute fraud and/or constructive fraud for treble damages;

5) An Order that Defendants pay all costs and expenses of suit incurred herein; and,

6) All such other and further relief as the Jury and/or Court deems just and proper.

Against Defendant MICHAEL CHARLES KELLER:

1) Replevin of all said losses wrongfully incurred and/or otherwise deprived;

2) Compensatory damages in the amount of $100,000 USD, including for pain and suffering;

3) Punitive and/or special damages according to proof;

4) Appropriate injunctive and declaratory relief pursuant to F.R.Cv.P. Rules 57 and 65 and/or the same relief pursuant to and under 28 USC §§ 2201 and 2202, not the least of which includes declaring Defendant's actions null and void for lack of due process, and that Defendant's actions constitute fraud and/or constructive fraud for treble damages;

5) An Order that Defendant pay all costs and expenses of suit incurred herein; and,

6) All such other and further relief as the Jury and/or Court deems just and proper.

Against Defendant THE COUNTY OF DALLAS, Texas:

1) Replevin of all said losses wrongfully incurred and/or otherwise deprived;

2) Compensatory damages in the amount of $10,000,000 USD, including for

pain and suffering;

3) Punitive and/or special damages according to proof;

4) Appropriate injunctive and declaratory relief pursuant to F.R.Cv.P. Rules 57 and 65 and/or the same relief pursuant to and under 28 USC §§ 2201 and 2202, not the least of which includes declaring Defendant's actions null and void for lack of due process, and that Defendant's actions constitute fraud and/or constructive fraud for treble damages;

5) An Order that Defendant pay all costs and expenses of suit incurred herein; and,

6) All such other and further relief as the Jury and/or Court deems just and proper.

Against Defendant THE CITY OF DALLAS, Texas:

1) Replevin of all said losses wrongfully incurred and/or otherwise deprived;

2) Compensatory damages in the amount of $10,000,000 USD, including for pain and suffering;

3) Punitive and/or special damages according to proof;

4) Appropriate injunctive and declaratory relief pursuant to F.R.Cv.P. Rules 57 and 65 and/or the same relief pursuant to and under 28 USC §§ 2201 and 2202, not the least of which includes declaring Defendant's actions null and void for lack of due process, and that Defendant's actions

constitute fraud and/or constructive fraud for treble damages;

5) An Order that Defendant pay all costs and expenses of suit incurred herein; and,

6) All such other and further relief as the Jury and/or Court deems just and proper.

## JURY DEMAND

Plaintiff Miller demands full trial by jury of all legal issues so triable within this cause, and likewise demands trial by jury of all equitable issues so triable, pursuant to F.R.Cv.P. Rule 5(d), Rule 38(b), and Rule 81(c)(3), also pursuant to any applicable Local Rules of this District, pursuant to the Seventh Amendment to the United States Constitution, further pursuant to the Texas Constitution, and also pursuant to the provisions of any other applicable law(s).

Respectfully submitted,

Bradley B. Miller
5701 Trail Meadow Drive
Dallas, TX 75230
Tel: (214) 923-9165
Email: tech@bbmcs.com
Pro Se Plaintiff

## VERIFICATION

I hereby declare, verify, certify and state, pursuant to the penalties of perjury

under the laws of the United States, and by the provisions of 28 USC § 1746, that

all of the above and foregoing representations are true and correct to the best of my

knowledge, information, and belief.

Executed at Dallas, Texas, this ___31st___ day of _____March_____, 2020.

Bradley B. Miller

## CERTIFICATE OF SERVICE

I hereby certify: that on this ___31st___ day of March, 2020, a true and complete

copy of the above complaint has been duly served upon the following:

Virginia Talley Dunn
7147 Azalea Lane
Dallas, TX 75230

Hon. Danielle Diaz
330th District Court
600 Commerce Street
Dallas, TX 75202

Hon. Andrea Plumlee
330th District Court
600 Commerce Street
Dallas, TX 75202

Patricia L. Rochelle #13732050
Rochelle McCullough LLP
325 North St. Paul Street # 4500
Dallas, TX 75201

VERIFIED COMPLAINT                126

David H. Findley # 24040901
Orsinger Nelson Downing & Anderson LLP
2600 Network Blvd., Ste. 200
Frisco, TX 75034-6010

Maryann Mihalopoulos # 03087475
Brousseau Naftis & Massingill, P.C.
3932 Potomac Ave.
Dallas, TX 75205

(*Counsel for The Hockaday School*)
Stuart M. Bumpas # 03340000
Locke Lord LLP
2200 Ross Ave., Ste. 2800
Dallas, TX 75201-6776

Meredith Leyendecker
4606 Gilbert Ave.
Dallas, TX 75219

Beth Taylor
3219 Saint Croix Dr.
Dallas, TX 75229

John Sughrue
4709 Watauga Rd.
Dallas, TX 75209

Lacie Darnell (#10468)
1400 S. Lamar Street
Dallas, TX 75215

Michael Charles Keller (#9888)
1400 S. Lamar Street
Dallas, TX 75215

(*Defendant Dallas County*)
(*Dallas County Judge*)
Hon. Clay Jenkins # 10617450
411 Elm Street #250
Dallas, TX 75202

(Defendant *The City of Dallas*)
(*Dallas City Attorney*)
Christopher J. Caso # 03969230
Interim City Attorney
1500 Marilla Street
Dallas, TX 75181

Bradley B. Miller

## Mail

| | |
|---|---|
| **From:** | "Talley Dunn" <tdunn@talleydunn.com> |
| **Date:** | Sunday, November 17, 2013 1:16 PM |
| **To:** | "Patty Rochelle" <PRochelle@rochellerankin.com>; "David Findley" <DFindley@rochellerankin.com> |
| **Attach:** | photo.JPG |
| **Subject:** | Dinig table |

Dining room table covered in documents on me.  Yearbook photos of me as a child.  Yearbook entries from friends.  Analysis of everything.

Sent from my iPhone
Talley Dunn
Talley Dunn Gallery
214.521.9898

Exhibit "A"
Page 1 of 3



| Property | Value |
|---|---|
| Origin | |
| Authors | |
| Date taken | 11/17/2013 11:18 AM |
| Program name | 4.1 |
| Date acquired | |
| Copyright | |
| Image | |
| Image ID | |
| Dimensions | 640 x 478 |
| Width | 640 pixels |
| Height | 478 pixels |
| Horizontal resolution | 72 dpi |
| Vertical resolution | 72 dpi |
| Bit depth | 24 |
| Compression | |
| Resolution unit | 2 |
| Color representation | sRGB |
| Compressed bits/pixel | |

| Property | Value |
|---|---|
| Camera | |
| Camera maker | Apple |
| Camera model | iPhone 4 |
| F-stop | f/2.8 |
| Exposure time | 1/120 sec. |
| ISO speed | ISO-80 |
| Exposure bias | |
| Focal length | 4 mm |
| Max aperture | |
| Metering mode | Average |
| Subject distance | |
| Flash mode | No flash, compulsory |
| Flash energy | |
| 35mm focal length | |
| Advanced photo | |
| Lens maker | |
| Lens model | |
| Flash maker | |

Exhibit "A"
Page 3 of 3

## Mail

| | |
|---|---|
| **From:** | "Maryann Sarris Brousseau" <maryann@bgmdallas.com> |
| **Date:** | Monday, November 10, 2014 6:41 PM |
| **To:** | <prochelle@rochellerankin.com>; "Talley Dunn" <tdunn@talleydunn.com> |
| **Subject:** | FW: Talley Dunn |

Patty        What if you move for a Protective Order based on this communication?        I am not sure I will be able to get the School to do anything legally        I am trying.

Maryann



**Maryann Sarris Brousseau** | 300 Knox Place | 4645 North        Central Expressway, Dallas, Texas 75205 |
(214) 220-1220 office | (214) 220-2770 fax        |        maryann@bnmdallas.com | www.bnmdallas.com
CONFIDENTIALITY NOTICE: This e-mail message and its attachments (if any) are for the sole use of the intended recipient(s) and may contain information that is (1) confidential, (2) subject to the attorney-client privilege or (3) an attorney work product. Any unauthorized review, use, disclosure or distribution of this information is prohibited. Unauthorized interception of this e-mail is a violation of federal criminal law. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. Thank you.

The following disclaimer is included to insure that we comply with U.S. Treasury Department Regulations.        The Regulations now require that either we (i) include the following disclaimer in most written Federal tax correspondence or (ii) undertake significant due diligence that we have not performed (but can perform on request).

ANY STATEMENTS CONTAINED HEREIN ARE NOT INTENDED OR WRITTEN BY THE UNDERSIGNED TO BE USED, AND NOTHING CONTAINED HEREIN CAN BE USED BY YOU OR ANY OTHER PERSON, (1) FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED UNDER FEDERAL TAX LAW, or (2) PROMOTING, MARKETING OR RECOMMENDING TO ANOTHER PARTY ANY TRANSACTION OR MATTER ADDRESSED HEREIN.

**From:** Maryann Sarris Brousseau [mailto:maryann@bgmdallas.com]
**Sent:** Monday, November 10, 2014 3:11 PM
**To:** 'Talley Dunn'; 'prochelle@rochellerankin.com'
**Subject:** FW: Talley Dunn
☐☐
Talley and Patty:

I received the e-mail and attachments from Bradley.        Although I find it bizarre and indication of how crazy he is, I        m certain it will never cause you to lose business over it because it is totally unbelievable and of no interest.        The only action I intend to take is to write him as Board Chair explaining that because this involves parents and children of the School, it is improper for me to address, and he needs to speak with the Kim Wargo, the Head of School.        Let me know if you want me to do anything else.

Maryann



**Maryann Sarris Brousseau** | 300 Knox Place | 4645 North        Central Expressway, Dallas, Texas 75205 |
(214) 220-1220 office | (214) 220-2770 fax        |        maryann@bnmdallas.com | www.bnmdallas.com
CONFIDENTIALITY NOTICE: This e-mail message and its attachments (if any) are for the sole use of the intended recipient(s) and may contain information that is (1) confidential, (2) subject to the attorney-client privilege or (3) an attorney work product. Any unauthorized review, use, disclosure or



**Exhibit "B"**
**Page 1 of 4**

distribution of this information is prohibited. Unauthorized interception of this e-mail is a violation of federal criminal law. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. Thank you.

The following disclaimer is included to insure that we comply with U.S. Treasury Department Regulations.   The Regulations now require that either we (i) include the following disclaimer in most written Federal tax correspondence or (ii) undertake significant due diligence that we have not performed (but can perform on request).

ANY STATEMENTS CONTAINED HEREIN ARE NOT INTENDED OR WRITTEN BY THE UNDERSIGNED TO BE USED, AND NOTHING CONTAINED HEREIN CAN BE USED BY YOU OR ANY OTHER PERSON, (1) FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED UNDER FEDERAL TAX LAW, or (2) PROMOTING, MARKETING OR RECOMMENDING TO ANOTHER PARTY ANY TRANSACTION OR MATTER ADDRESSED HEREIN.

**From:** Bradley Miller [mailto:bradley@bbmcs.com]
**Sent:** Sunday, November 09, 2014 8:50 PM
**To:** Maryann Mihalopolous
**Cc:** Ron Massingil; David Haemisegger
**Subject:** Talley Dunn
☐☐
Maryann:

Can you explain why Talley Dunn has not been dismissed from the Hockaday Board of Trustees?

I wrote David Haemisegger with my concerns on April 9 but received no response. In brief, Talley specifically used her position as Hockaday Board Chair to establish her credibility in court while committing perjury.   Talley previously subjected another Hockaday parent, Lisa Brown, to similar abuse, also involving pervasive lies.

(I am copying your law partner Ron Massingil because he represented a friend of mine in a similar case against Talley's lawyer, Patricia Rochelle, who apparently uses false TRO affidavits with some frequency in representing predatory clients. Ron can tell you his experience with Patty. I am also attaching some of the evidence I presented in court; as a family attorney yourself, you should have the ability to parse it.)

Following is a highly compressed summary of the events of the last three years:

-Talley lied to me extensively about her business partner, Lisa Brown, throughout 2011 while forcing her out of the gallery.
        -Talley told me that Lisa had stolen a $50,000 Chihuly Venetian glass piece in 1994 and then offered to sell it in 2010.
                -I didn't realize that Talley was lying about this episode, and Lisa's other alleged "stealing," until April 2013.

-Talley forced Lisa out of the gallery with no compensation for the business itself.
        -Talley played the victim throughout their long legal battle in 2011.
        -Talley lied to the press about the reasons for Lisa Brown's departure.
        -Talley influenced the Director of the Nasher Sculpture center, who excluded important artwork from this years'
        David Bates retrospective, simply because it was owned by a client and supporter of Lisa's (Newt Walker).
        -David Bates lent Talley $250,000 to buy out Lisa's part of the gallery building.
                -(Talley had previously requested this loan from David Haemisegger, who declined.)
                -(Around this time, Talley told me that "an older man" would be interested in her.)
        -Talley called Lisa "crazy" and gave her the nickname "Charlie Sheen".
                -Meanwhile, Talley still has property of Lisa's (a cast-iron day bed) that she will not return, after months of notices.
        -Lisa lost her business, and relationships with artists she had fostered over 20 years.
-Talley gagged Lisa with a confidentiality agreement.   (I only found out about that earlier this year.)
**-After witnessing an odd interaction in January 2012, I discovered that Talley had been sending**
☐☐ ☐☐**emotional, sometimes romantic text messages to David Bates.** [Attached.]
        -Talley lied to me extensively about these texts and other interactions with David Bates.
        -When I asked about them, Talley responded with rage, profanity, and suicide threats. [8/29/12 clip.]
        -(Sales of David Bates' artwork primarily funded Talley's legal onslaught against me and my family.)

**-Talley became obsessed with moving our daughter to Hockaday from Lamplighter.** [Audio clips attached.]

Exhibit "B"
Page 2 of 4

-She threatened to "f---ing divorce" me if we didn't move our daughter to Hockaday immediately.
-Talley apparently plotted with a lawyer for months to effect this plan.

-She told our daughter that "boys are bad" and said that "boys don't belong in the same classroom as girls."
-Talley filed for divorce on 2/13/2013--the day the Lamplighter tuition deposit was due.
-Talley filed a TRO with an affidavit claiming that I had been violent and abusive toward her and our daughter.
    -These are outright lies, and there is zero evidence of any such behavior--because it never happened.
    -(I took our daughter by myself to Nevada the weekend before Talley filed for divorce. Talley helped arrange that trip.)
    -Talley has repeated these lies to various friends and acquaintances of ours. (Perhaps even you.)
-Talley repeated these lies in court in our first full hearing on March 27, 2013, and in subsequent hearings.
    -Talley's lawyer, Patty Rochelle, also lied repeatedly in several hearings on Talley's behalf.
    -**Talley used her position as Hockaday Board Chair to establish her credibility** despite a lack of evidence.

As a result of Talley's lies and other fraudulent actions,

-I was kicked out of my home without due process.
    -I have had to live with my parents in their small house from February 2013 to the present.
-I was given zero access to community assets to pay for legal fees or housing during the divorce.
    -(That happened due to Talley's lies to the court about the gallery income, as well as judicial incompetence.)

-I therefore have had to borrow around $270,000 from my elderly parents to pay for legal fees.
-The court imposed a supervision requirement, and **for 5 months, I had to be supervised while with my daughter.**
    -(Talley offered to lift this supervision requirement right before the June/July 2013 appeal, if I let Virginia go to Hockaday.)
    -Talley would not allow my parents to supervise, and the court went along with her.
    -Supervision was overturned on appeal to the District Judge.
    -The judge reproached Talley, but there was no sanction for obvious perjury, so Talley got what she wanted.

-Virginia was moved out of a familiar, healthy (and co-ed) environment at Lamplighter without my permission.
-My father, Robert Miller, had a near-fatal heart attack from stress in April 2013. Another ICU visit this past February.
    -Both of my parents have suffered immensely from stress, stemming from Talley's constant legal harassment.
-Friends I have known for decades--including my daughter's godmother--will not talk to me. Talley has conned them.

-I was illegally gagged from November 2013-April 2014 at Talley's request. I was unable to recruit witnesses or defend
    myself in public.
    -I had to hire an appellate attorney to regain my First Amendment rights.
-I lost my home.
-I got no part of the gallery, which I had helped build with extensive unpaid labor since 1999.
    -As she did with Lisa Brown, Talley said she was not going to give me "one dime" for the business.
    -I got no part of the artwork we acquired before our marriage in 2004. (We lived together from 1993 on.)

-I got less from our estate than I have been forced to spend in legal fees. I cannot repay my parents.
-Talley was granted Primary Conservatorship of Virginia and therefore has her around 70% of the time.
    -This is my greatest concern. In June of last year, Virginia told me, **"Mommy said you didn't want me."**

(You may recognize this behavior if you have seen the Nicole Kidman movie *To Die For*, which is a portrayal of malignant narcissism. The article "Rethinking Female Sociopathy" also explores it. People like this simply do

**Exhibit "B"**
**Page 3 of 4**

not have a conscience. In a deposition earlier this year, Chuck Brown, Lisa's husband, called Talley "evil" and "a monster.")

There is absolutely no excuse for accepting the ongoing abuse of members of the Hockaday community by a Trustee, or for accepting abusive and/or criminal conduct of any kind by a Trustee. As such, there is no excuse for Talley Dunn's continued presence on the Board, or in any leadership role at Hockaday. It sends a horrendous message, and it is antithetical to everything Hockaday claims to stand for. An institution that allows such conduct is not an environment I want my daughter to grow up in.

The NFL got this right recently, when both Ray Rice and Adrian Peterson were suspended after clear evidence of abuse surfaced. Not every abuser is a football player--or a man. But no matter who they are, and whether their weapon is a fist, a stick, or a well-crafted lie, abusers must be held accountable for their actions. If there are no consequences, they will continue to do harm.

As Louis Brandeis said, sunlight is the best disinfectant. Sometimes, public scrutiny is the best catalyst for change, and open dialog is the first step on a healthier path. I welcome any comments or questions you may have, and I expect your prompt reply.

Sincerely,


Bradley Miller


P.S. I also encourage you to look into why Hockaday enrolled my daughter in 2013 in contravention of a court order, when I had made both the Head of School and the Admissions Office aware of the court situation and my objections ahead of time. Talley's expensive charade in court would have ended quickly if the school had refused to go along with her scheme. Assisting in the destruction of my father's financial security and health-- and his relationship with his only grandchild--is a perverse repayment for the support he has given Hockaday over the years.

**Exhibit "B"**
Page 4 of 4

NO. DF-13-02616-Y

|  |  |  |
|---|---|---|
| | § | |
| IN THE MATTER OF | § | IN THE DISTRICT COURT |
| THE MARRIAGE OF | § | |
| | § | |
| V.T.D. | § | |
| AND | § | 330th JUDICIAL COURT |
| B.B.M. | § | |
| | § | |
| AND IN THE INTEREST | § | |
| OF V.I.P.M. | § | DALLAS COUNTY, TEXAS |
| A CHILD | § | |
| | § | |
| | § | |

## AFFIDAVIT OF BRADLEY BRIGGLE MILLER

STATE OF TEXAS           §
                         §
COUNTY OF DALLAS         §

Before me, the undersigned authority, on this day personally appeared BRADLEY BRIGGLE MILLER who stated under oath as follows:

"My name is Bradley Briggle Miller. I am above the age of eighteen years, and I am fully competent to make this Affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

"I am the Respondent in this case. I am divorced from VIRGINIA TALLEY DUNN (hereafter "Talley Dunn"), who is the plaintiff in this case. We have one child, V███████ I███ P███ M███, who is seven years old.

"Talley Dunn has engaged in a pattern of abuse and harassment of me over the past three years. It began in 2012, when I discovered that she was conducting an inappropriate relationship with artist David Bates, and when I objected to her moving our daughter to the Hockaday School immediately. She began to heap verbal and emotional abuse on me with increasing frequency, threatening to kill herself, to kill me, and to 'fucking divorce' me if our daughter didn't move to Hockaday immediately.

**AFFIDAVIT OF BRADLEY BRIGGLE MILLER - PAGE 1**

**Exhibit "C"**
**Page 1 of 3**

"The abuse continued in 2013, when she filed for divorce, attaching an affidavit that leveled false claims of family violence against me. All of the claims of violent behavior she described were fabricated. She made these false claims in order to conceal the inappropriate relationship mentioned above, to have the Court evict me from my home, and in the attempt to gain control of our daughter's school choice. She never presented any evidence of the violent behavior she described—because there couldn't be any evidence, as these alleged events never occurred. On the other hand, I had copious evidence of Talley Dunn's abusive, threatening, and bullying behavior toward me, including recordings of some of our phone conversations. I had begun making these phone recordings because her behavior had become frighteningly erratic, and I was hoping that her psychiatrist could help her if I gave him evidence of what she was doing.

"Talley Dunn's abuse of me continued in Court, when she repeated the false claims of family violence against me—committing perjury. As a result, a 5-month supervision requirement was imposed on me. During that period, I had to have a supervisor present in order to see my daughter. It was excruciating. This supervision requirement was overturned on appeal to the District Judge, who heard the recordings mentioned above. Dunn's actions during the divorce forced me to spend over $270,000 in legal fees, almost all of which came from my elderly parents' retirement funds. That obscene amount was more than my eventual share the estate, but I had no choice but to respond to Dunn's constant barrage of legal filings and other manoeuvres.

"But even the divorce being final didn't stop Talley Dunn's abusive behavior. Yet another instance occurred in this past month.

"The latest incident took place on Saturday, April 11, 2015. I was invited to a tour of the Dallas Art Fair today given by co-founder John Sughrue for the Yale and Harvard Clubs of Dallas. (I am a Yale graduate.) I attended the tour, which started at 11:00 a.m.. It ended in the Art Fair offices on the upper floor of the Fashion Industry Gallery building; we passed the Talley Dunn Gallery booth on the way into and out of the Art Fair management offices.

"I then proceeded to see the rest of the fair on my own. I spoke with Laura Green (Valley House Gallery) and Barry Whistler (Barry Whistler Gallery), both of whom I know, in their booths. As I was walking down another aisle, at about 12:40 p.m., a male police officer came up to me and asked, 'Are you Bradley Miller?' I said, 'Yes,' and he asked me to accompany him outside. We walked back to the Art Fair offices foyer. As we walked, I asked if my ex-wife, Talley Dunn, had put him up to this, and he said 'Yes, I will explain when we get outside.'

"In the foyer area, the DPD officer then asked me if I had a 'restraining order' against me. I said that I had no physical restraining order whatsoever. I had a temporary injunction limiting my ability to speak to certain people about what my ex-wife had done during our divorce. I said we had a divorce starting in 2013, and she was now suing me in Civil Court. I said that my ex-wife is a pathological liar and has lied in court numerous times. Another female officer joined us. (The two DPD officers were Michael Charles Keller #9888 and Lacie Darnell #10468.)

**AFFIDAVIT OF BRADLEY BRIGGLE MILLER - PAGE 2**

**Exhibit "C"**
**Page 2 of 3**

"The male officer said I would have to leave. I told him I was a guest of the Dallas Art Fair and of the Yale and Harvard Clubs of Dallas and that I had just been on a tour with John Sughrue. At that point, a woman came up with a Dallas Art Fair badge (her name is Tracy Moberley). I asked the officers if they worked for the Art Fair or Ray Hunt (who owns the building). The officers said they worked for the building owner; Tracy said she worked for John Sughrue. The officers said if I didn't leave, they would have to charge me with "CT." (I asked what that was—'criminal trespass'.) I said I wasn't trespassing; I was an invited guest. I said that Talley Dunn had no authority over the event or over me. The officers said that since she was renting a booth at the building, she could make a complaint, and I would have to leave.

"I told the officers and Ms. Moberley that my ex-wife, Talley Dunn, had been harassing me for three years. I also told the officers that Talley had previously filed a false police report against me and requested a protective order, which was denied (by Judge Andrew Ten Eyckon 9/6/2013).

"I told the officers I understood that they were just doing their job, and they were acting professionally, but that Talley Dunn was now using them to harass me. Tracy Moberley asked for my name and said she would talk over the incident with John Sughrue. I thanked her and left with the officers, who walked me outside and said I could not return. I then left at around 12:50 p.m..

"Talley Dunn apparently made a false report to a police Officer in claiming that I had a 'restraining order' against me and using that as a basis to demand my removal from the Dallas Art Fair. At no point did I ever speak to Talley Dunn or her employees, or enter her booth. I never saw Talley Dunn. I did see her employees, Beth Taylor and Meredith Leyendecker. A detailed report on the incident is forthcoming from the Dallas Art Fair management.

"Talley Dunn has shown a long-standing willingness and tendency to harass me, using lies, manipulation, and any other means at her disposal, including making false statements to law enforcement. If the Court does not address this issue with sanctions, Dunn's abusive behavior is likely to continue indefinitely. And if her mental condition continues to deteriorate, the welfare and safety of the Child could be jeopardized."

Further Affiant sayeth not.

Bradley Briggle Miller

SIGNED under oath before me on May 15, 2015.

Notary Public, State of Texas

**AFFIDAVIT OF BRADLEY BRIGGLE MILLER - PAGE 3**

STEVEN JONES
My Commission Expires
July 3, 2017

**Exhibit "C"**
**Page 3 of 3**

## Mail

| | |
|---|---|
| **From:** | "John Sughrue" <jsughrue@brookpartners.com> |
| **Date:** | Friday, May 15, 2015 5:46 PM |
| **To:** | "Talley Dunn" <tdunn@talleydunn.com> |
| **Cc:** | "Dan Hartsfield" <Dan.Hartsfield@jacksonlewis.com>; "Clifford J. Risman" <crisman@gardere.com> |
| **Subject:** | Re: Please contact Dan Hartsfield |

Tally, sure thing. Dan, I've included Cliff Risman in this response and why don't you and Cliff connect on this matter. I did talk to Cliff today after speaking with Tally. Thank you.

Sent from my iPhone

> On May 15, 2015, at 5:40 PM, Talley Dunn <tdunn@talleydunn.com> wrote:
>
> Hi John,
>
> Could you please ask your attorney to contact my attorney Dan Hartsfield at Jackson Lewis before responding to Bradley Miller?
>
> I've copied Dan on this email.
>
> Thank you so much.
>
> Sincerely,
>
> Talley
>
>
>
> Sent from my iPhone
> Talley Dunn
> Talley Dunn Gallery
> 5020 Tracy Street
> Dallas TX 75205
> 214.521.9898
>

**Exhibit "D"**
**Page 1 of 1**



# Hockaday Benefit Underwriters

The following individuals were underwriters for
The Hockaday Parents' Association Club 1913 – Welcoming
Dr. Karen Warren Coleman. The Benefit raised $346,695
for the Ann Graves Child Development Center.

**Exhibit "E"**
**Page 1 of 1**

JS 44 (Rev. 06/17) - TXND (Rev. 06/17)

# CIVIL COVER SHEET

RECEIVED

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

**Bradley B. Miller**

**(b)** County of Residence of First Listed Plaintiff **Dallas Cty, TX**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)* **(Pro Se)**

5701 Trail Meadow Dr
Dallas TX 75230 (214-923-9165)

## DEFENDANTS

CLERK U.S. DISTRICT COURT

Virginia Talley Dunn, Andrea Plumlee Northern District of Texas, David H. Findley, Maryann Mihalopoulos, The Hockaday School, Marsha Leyendecker, Beth Taylor, John Sughrue, Lacie Darnell, Michael Charles Keller, The County of Dallas, TX, The City of Dallas, TX.

County of Residence of First Listed Defendant   Dallas County (Dunn)
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

3:20CV-759-E

Attorneys *(If Known)*   **(for Dunn):**

Patricia L. Rochelle (Texas Bar # 13732050)
David H. Findley (Texas Bar # 24040901)

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question *(U.S. Government Not a Party)*
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| | | | | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. 1983

Brief description of cause:
Suit for civil rights violations and conspiracy against rights, plus related torts.

## VII. REQUESTED IN COMPLAINT:

- ☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $** 10,000,000.00

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE   (See separate Notice of Related Cases.)   DOCKET NUMBER

DATE  03/31/2020

SIGNATURE OF ATTORNEY OF RECORD   Pro Se

## FOR OFFICE USE ONLY

RECEIPT #  _____   AMOUNT  _____   APPLYING IFP  _____   JUDGE  _____   MAG. JUDGE  _____